# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JUAN MATA, on his own behalf
and as Parent and Next Friend of
JAM and GM, minors,

      Plaintiff,

vs.                                                                      No. CIV 10-0366 JB/LFG

THE CITY OF FARMINGTON,
Farmington Police Department,
a municipality organized under the
laws of the State of New Mexico and
its Police Department;

TYLER RAHN, an Officer of the
Farmington Police Department,
Individually and in his Official Capacity;

ROBERT J. PEREZ, an Officer (Sergeant)
of the Farmington Police Department,
Individually and in his Official Capacity;

JOHN AHLM, an Officer of the
Farmington Police Department,
Individually and in his Official Capacity;

JEFFREY BROWNING, an Officer of the
Farmington Police Department,
Individually and in his Official Capacity;

DANIEL BROZZO, an Officer of the
Farmington Police Department,
Individually and in his Official Capacity;

MIKE BRISENO, a/k/a Mike Briseno,
an Officer of the Farmington Police Department,
Individually and in his Official Capacity,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the City Defendants' Motion for Partial Summary Judgment No. I: Motion by Officers Rahn and Ahlm for Qualified Immunity on Excessive Force and Failure to Intervene Claims in Counts I and II, filed March 31, 2011 (Doc. 50)("Motion"); and (ii) the Motion to Strike Certain References in Plaintiffs' Response to City Defendants' Motion for Partial Summary Judgment No. I *[Docket No. 55]*, filed April 22, 2011 (Doc. 62).  The Court held a hearing on May 6, 2011.  The primary issues are: (i) whether the Court should strike certain references in Plaintiff Juan Mata's response because they are irrelevant and not in accord with the Court's summary judgment procedures; (ii) whether Defendant Tyler Rahn used excessive force when he pointed his police revolver at Plaintiff Juan Mata and J.A.M.; and (ii) whether Defendant John Ahlm violated Mata's and J.A.M.'s constitutional rights by not intervening to prevent Rahn from violating Mata and J.A.M.'s constitutional rights.  The Court will deny the motion to strike. The Court will not strike the references in Mata's response, because this drastic remedy is generally disfavored, and the Court does not believe that it is necessary in this situation.  The Court will grant in part and deny in part the motion for partial summary judgment that Rahn and Ahlm (together "the Officer Defendants") filed.  The Court finds that Rahn is entitled to summary judgment on Mata's excessive force claim on G.M.'s behalf, but that he is not entitled to summary judgment on Mata's excessive force claims on his own behalf and on J.A.M.'s behalf.  Mata cannot show that Rahn's conduct violated G.M.'s constitutional rights, because G.M. was not seized.  The Court will thus grant summary judgment for Rahn against Mata's excessive force claim on G.M.'s behalf on the grounds of qualified immunity.  A reasonable jury could find, however, that Rahn's conduct violated Mata's and J.A.M.'s Fourth-Amendment rights.  The Court finds that these rights were clearly established at the time of the alleged violation.  Because a reasonable jury could find that Rahn's

conduct violated Mata's and J.A.M.'s Fourth-Amendment Rights, Rahn is not entitled to judgment as a matter of law, and the Court will deny his request for summary judgment on Mata's excessive force claims on his behalf and on J.A.M.'s behalf on the grounds of qualified immunity.  The Court finds that Ahlm is entitled to qualified immunity on Mata's failure-to-intervene claim on G.M.'s behalf, because Mata cannot show that Rahn violated G.M.'s constitutional rights, and establishing a constitutional violation is a necessary predicate to any claim that an officer failed to intervene. The Court further finds that Ahlm is not entitled to qualified immunity on Mata's failure-to-intervene claims on his behalf and on J.A.M.'s behalf, because there is an issue of fact whether Ahlm had a realistic opportunity to intervene to prevent Rahn's alleged excessive use of force.

## FACTUAL BACKGROUND

In his Response, Mata asserts certain facts regarding the history of Mata's relationship with the Farmington Police Department ("FPD").  Although the Officer Defendants moved to strike these references, arguing that they were irrelevant and did not conform with the local rules on summary judgment procedure, the Court will not strike these references; instead, it will include the asserted facts that Mata has supported through references to the record as factual background and will address whether these facts are material in its analysis.

Mata and several of his family members filed a civil-rights lawsuit on November 28, 2004 against the City of Farmington and several police officers, alleging that his civil rights were violated during a November 29, 2002 arrest in which he was pepper sprayed by an FPD officer; the matter was later settled for $75,000.00.  See Mata v. Anderson, 685 F. Supp. 2d 1223, 1236 (D.N.M. 2010). Mata alleges that, after the case was filed, FPD officers routinely harassed and intimidated his family by following them around town, and by stopping in front of their home for no apparent reason and shining their spotlights on the windows.  See Deposition of Juan Mata at 117:13-20,

119:8-11, 121:17-122:13, 127:15-23, 262:19-25, 277:1-21 (taken February 3 and 4, 2011), filed April 14, 2011 (Doc. 55-1).  Mata publicly protested FPD Officer Mike Briseno; Mata stood in front of the police department, holding up a sign, and he signed a petition asking for an investigation of Briseno's conduct.  See Mata Depo. at 19:17-21:6.  Mata alleges that the FPD negatively reacted to a series of articles that the Daily Times in Farmington ran about his family's lawsuit and that, after the articles ran, the police intensified their actions of following him, spotlighting him, and driving by his house.  See Mata Depo. at 363:22-364:10.  Mata alleges that FPD police officers attempted to plant methamphetamine at his residence.  See Mata Depo. at 63:8-64:17.  Mata further alleges that, on April 2, 2007, a police officer stopped him and gave him a warning, allegedly because the officer could not see that his license plate lights were on, but a video of the incident shows that his license plate lights worked.  See Mata Depo. at 130:6-132:18.

On June 16, 2008, at approximately 8:40 p.m., Ahlm, a FPD officer, and FPD Corporal Kee, who was traveling in Ahlm's squad car, stopped a dark blue sports utility vehicle ("SUV") on the street in front of Mata's residence at 408 Sycamore in Farmington.  See, e.g., Complaint for Civil Rights Violations ¶¶ 31-32, at 7, filed April 15, 2010 (Doc. 1); Deposition of John Ahlm at 39:7-25, 41:16-21 (taken February 24, 2011), filed March 31, 2011 (Doc. 50-2); Dashcam Video from Officer Ahlm's Squad Car, FPD Unit 9853 at 20:38:36, filed March 31, 2011 (Doc. 53, Ex. C)("Unit 9853 Dashcam"); Motion ¶ 1, at 7-8 (setting forth this fact); Plaintiffs' Response to City Defendants' Motion for Partial Summary Judgment No. I: Motion by Officers Rahn and Ahlm for Qualified Immunity on Excessive Force and Failure to Intervene Claims in Counts I and II, at 4, filed April 14, 2011 (Doc. 55)("Response")(not controverting this fact).  Ahlm advised the driver of the dark blue SUV, Valentin Araiza, that he had stopped him because the vehicle's license plate was covered by a piece of plastic, obscuring the license plate's numbers from view.  See, e.g., Ahlm Depo. at

42:2-4; Unit 9853 Dashcam at 20:38:47-20:39:04; Motion ¶ 2, at 8 (setting forth this fact); Response at 4 (not controverting this fact).

As Ahlm was trying to get Araiza's license and registration, an individual who was watching the traffic stop started cursing at Ahlm and telling the officer to get off the property.  See Ahlm Depo. at 42:22-43:17; Unit 9853 Dashcam at 20:39:52-20:42:32.  Ahlm asked the individual to stay behind the gate to the property so that he could complete the paperwork for the traffic stop, but the individual continued to protest that the officer was on his property.  See Unit 9853 Dashcam at 20:39:52-20:42:50.  Within several minutes of pulling Araiza over, a number of individuals had gathered in the yard at 408 Sycamore, and others were walking in and out of the yard and onto the sidewalk just in front of the traffic stop or approaching the scene of the traffic stop from the side.[1]

_____

[1] The Officer Defendants assert that, as Ahlm

> was trying to get Mr. Araiza's license and registration, one of the occupants of 408 Sycamore started cursing at him and telling the officer to get off the property. Officer Ahlm asked the individual to stay behind the gate to the property so that he could complete the paperwork for the traffic stop, but the individual continued to protest that the officer was on his property. Within minutes of pulling Mr. Araiza over, a number of individuals had gathered in the yard at 408 Sycamore, and others were walking in and out of the yard and onto the sidewalk just in front of the traffic stop or approaching the scene from the side.

Motion ¶¶ 3-5, at 8 (internal citations omitted).  Mata disputes these asserted facts, stating that "the video evidence of the incident shows that the individual cursing at the police was not the Plaintiff, and shows the Plaintiff beside his automobile with a video camera waiting for the officers to remove the suspect's vehicle from in front of his driveway so he could leave."  Response ¶ 2, at 4-5 (citing Exhibit 1(9853) 20:39:38-43:37).  Mata cites to the dashcam video from unit 9853 as his Exhibit 1; throughout his response, he also cites to the dashcam videos from units 9844 and 10029 as Exhibit 1. Mata does not, however, place Exhibit 1 in the record.  It appears, however, that the dashcam videos to which Mata cites as his Exhibit 1 are the same as the dashcam videos that the Officer Defendants attached to their motion for summary judgment as exhibits C, D, and F.  Unit 9853 Dashcam depicts an individual cussing at the officers and telling them to get off the property.  See Unit 9853 Dashcam at 20:39:52-20:42:32.  In their asserted undisputed facts, the Officer Defendants did not assert that this individual was Mata.  Mata has not directed the Court's attention to evidence controverting the Officer Defendants' asserted facts.  D.N.M.LR-Civ. 56.1(b) states:

See Ahlm Depo. at 42:22-43:23; Unit 9853 Dashcam at 20:42:32-20:43:29.

Ahlm grew concerned about the number of individuals who were walking in and out of the traffic stop area -- including some small children, about the level of incivility between one individual and the officers, and about his ability to exercise control over the traffic stop under these circumstances.[2]   See Ahlm Depo. at 43:15-23, 45:1-7, 48:1-16, 52:1-4; Unit 9853 Dashcam at

> The memorandum in support of the motion must initially set out a concise statement of all material facts as to which movant contends no genuine issue exists. The facts must be numbered and must refer with particularity to those portions of the record upon which movant relies.
>
> A memorandum in opposition to the motion must contain a concise statement of the material facts as to which the party contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the opposing party relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted.

D.N.M. LR-Civ. 56.1(b).   Because Mata has not directed the Court's attention to evidence controverting the Officer Defendants' asserted facts, the Court will deem the Officer Defendants' asserted facts admitted.

[2] The Officer Defendants assert: "Officer Ahlm grew concerned about the number of individuals who were walking in and out of the traffic stop area (including some with small children), the general level of incivility, and about his ability to exercise control over the traffic stop under these circumstances."  Motion ¶ 6, at 8-9 (citations omitted).  Mata

> disputes the allegations in [paragraph 6 regarding the general level of incivility]: the incivility was caused by the overbearing and threatening manner of the officers where they began ordering persons around where they were on their own property. *See e.g.*, Exhibit 1 (9853) (the best view of the events before the Plaintiff was assaulted by officer Rahn, 20:39:38; and Deposition of Juan Mata taken herein, pp. 169-171, wherein the Plaintiff describes the officer as talking in a loud voice and states that if the officer had asked him to go inside in a pleasant manner there would have been no problem.  Further, note that the acrimonious dialogue was between the officers and a single individual, and not a group of unruly persons as suggested by the Defendants.  *Id.*

Response ¶ 3, at 5.  Mata did not include the portion of his deposition to which he cites.  Although Mata also did not place Exhibit 1 in the record, Unit 9853 Dashcam shows that one individual spoke

20:39:25-20:44:03; Dashcam Video from Officer Rahn's Squad Car, FPD Unit 9844 at 20:43:23,

filed March 31, 2011 (Doc. 53, Ex. D)("Unit 9844 Dashcam"); Deposition of Tyler Rahn at 28:10-

13, 29:1-4, 33:13-23 (taken February 23, 2011), filed March 31, 2011 (Doc. 50-3).  The officers

radioed for police backup to help manage the individuals who had gathered in the traffic-stop area.

See Rahn Depo. at 28:10-13, 29:1-4.  Officer Jeffrey Browning and Rahn arrived on the scene

approximately five minutes after Ahlm pulled over Araiza.[3]  See Unit 9844 Dashcam at 20:43:30;

_____

to the officers in a loud manner, using profanities, and that the officers warned the individual against
behaving in that manner towards them.  See Unit 9853 Dashcam at 20:40:39-20:44:07.  Because the
Court must construe the evidence in the light most favorable to the non-moving party, the Court will
accept as true Mata's version of the Officer Defendants' asserted fact -- that the acrimonious
dialogue was between the officers and a single individual.  See Hunt v. Cromartie, 526 U.S. 541,
551 (1999) (stating that the court must resolve all reasonable inferences and doubts in favor of the
non-moving party, and construe all evidence in the light most favorable to the non-moving party).

[3] The Officer Defendants assert that Browning and Rahn arrived on the scene approximately
five minutes after Ahlm pulled over Araiza.  See Motion ¶ 7, at 9 (citations omitted).  Mata

> does not dispute that Defendants Rahn and Browning arrived as stated in
> Defendants' Facts, ¶ 7, however, note that the video recording taken by the
> Plaintiff's video camera, . . . shows Defendant Rahn to be in an angry and aggravated
> mood, walking around with his nightstick out of its ring, prior to his assault with a
> firearm on the Plaintiff.

Response ¶ 4, at 5-6 (citing Exhibit 3 at 0:55 min; Deposition of Juan Mata at 202 (taken February
3 and 4, 2011), filed April 14, 2011 (Doc. 55-1)).  Although Mata placed portions of his deposition
in the record, he did not include the portion of his deposition to which he cites to controvert the
Officer Defendants' asserted fact. Mata also did not place Exhibit 3 -- a video recording taken by
his video camera -- in the record.  It appears, however, that the Officer Defendants' Exhibit G -- a
videotape that Fransisco Mata shot -- is the same as Mata's Exhibit 3.  Although Mata's videotape
shows a brief shot of Rahn with his nightstick out before putting the nightstick away, the video does
not depict Rahn yelling -- or even speaking -- or interacting with any of the individuals watching
the traffic stop.  See Videotape shot by Fransisco Mata at 8:39:55-8:40:10, filed March 31, 2011
(Doc. 54, Ex. G)("Mata Videotape").  This videotape does not controvert the Officer Defendants'
assertion that Rahn and Browning arrived on the scene approximately five minutes after Ahlm
pulled over Arazia.  Because Mata has not directed the Court to evidence in the record which
controverts the Officer Defendants' asserted facts, the Court will deem the Officer Defendants'
asserted facts admitted.  See D.N.M. LR-Civ. 56.1(b).

Dashcam Video From Officer Browning's squad car, FPD Unit 10029 at 20:43:18, filed March 31, 2011 (Doc. 53, Ex. F)("Unit 10029 Dashcam").

As Ahlm began to brief Rahn and Browning, one of the individuals in the crowd started to interrupt and protest anew that it was his property.  See Unit 9844 Dashcam at 20:43:30-57.  At that point, Kee advised Ahlm that he was going to have Araiza back up so that Mata could get out of his driveway; Mata then began to back out his gold SUV from the driveway.  See Unit 9844 Dashcam at 20:43:56-20:44:14; Unit 10029 Dashcam at 20:43:56-20:44:14; Mata Videotape at 8:41:17-30.  As Mata continued to back his vehicle out of the driveway, the individual who had earlier been challenging Ahlm continued to yell at the officers, insisting that they were on private property and referring to them with profanities.[4]  See Unit 9844 Dashcam at 20:44:09-39.

As Mata began to pull slowly forward in front of Araiza's vehicle, Kee called out "Put your

---

[4] The Officer Defendants assert:

> As Officer Ahlm began to brief Officer Rahn and Officer Browing [sic], one of the individuals in the crowd started to interrupt and protest anew that it was his property. At that point, Corporal Kee advised Officer Ahlm that he was going to have Mr. Araiza back up so that Mr. Mata could get out of his driveway, and Mr. Mata began to back out his gold SUV from the driveway.  As Mr. Mata continued to back his vehicle out of the driveway, the individual who had been challenging Officer Ahlm continued to yell at the officers, insisting that they were on private property and referring to them with profanities.

Motion ¶¶ 8-10, at 9 (internal citations omitted).  Mata states that he does not "dispute that an individual was acting in a loud and unruly manner as alleged in Defendants' Facts ¶¶ 8-10, and further states that the videos of the incident show that the Plaintiff himself acted in a civil manner prior to the time that Defendant Rahn assaulted him with a firearm," and that he does "not dispute the remaining allegations in Defendants' Facts ¶ 8-10."  Response ¶¶ 5-6, at 6 (citing Exhibit 1 (9853) at 20:39:38-43:37).  Although Mata did not submit Exhibit 1, Unit 9853 Dashcam depicts and individual yelling at the officers and referring to them with profanities.  See Unit 9844 Dashcam at 20:44:09-39.  The Officer Defendants do not assert that the unruly individual was Mata, and Mata does not direct the Court's attention to evidence in the record which controverts the Officer Defendants' asserted facts.  The Court will thus deem the Officer Defendants' asserted facts admitted.  See D.N.M. LR-Civ. 56.1(b).

seat belt on," twice; Mata continued to slowly move his vehicle forward.  Unit 9853 Dashcam at 20:44:40-50; Unit 9844 Dashcam at 20:44:43-50.  Kee and Ahlm ordered Mata to stop his vehicle as they walked up to the drivers' side window of Mata's vehicle.  See Unit 9853 Dashcam at 20:44:46-55; Unit 9844 Dashcam 20:44:36-55.  Mata yelled: "What? I'm gonna put it on man.  What the hell?"  Unit 9853 Dashcam 20:44:50-57.  Ahlm warned him to put the seatbelt on immediately or he would write him a ticket, and Mata responded: "Write me a ticket then . . . I'm not even fucking driving;" Mata and Ahlm then engaged in an acrimonious dispute whether Mata was driving and whether his vehicle was moving.  See Unit 9853 Dashcam at 20:44:50-20:45:09; Unit 9844 Dashcam at 20:44:50-20:45:09.  Ahlm told Mata he was going to write him a ticket and told Mata that he was not free leave, saying: "Don't leave, you're not free to leave, sir."  Unit 9853 Dashcam at 20:45:05-10.  As Ahlm had his back turned and was heading over to the squad car, Mata responded,  saying  "Well,  I  need  to  go,"  and  proceeded  to  slowly  pull  forward.[5]

---

[5] The Officer Defendants assert:

> As Mr. Mata began to pull slowly forward in front of Mr. Araiza's vehicle, Corporal Kee called out "Put your seat belt on" twice, but Mr. Mata continued to move his vehicle forward.  Corporal Kee and Officer Ahlm then ordered Mr. Mata to stop his vehicle as they walked up to the drivers' side window of Mr. Mata's vehicle.  Mr. Mata yelled back "What? I'm gonna put it on, man.  What the hell?"  Officer Ahlm warned him to put the seatbelt on immediately or he would write him a ticket, and Mr. Mata responded "Write me a ticket then. . . . I'm not even f-ing moving," and began to argue with Officer Ahlm as to whether he had to have the seatbelt fastened when he was not moving.  Officer Ahlm responded "Okay," and told Mr. Mata that he was going to write him a ticket and ordered him not to go, advising Mr. Mata that he was "not free to leave."  As Officer Ahlm had his back turned and was heading over to his squad car, Mr. Mata responded, saying "Well, I need to go," and proceeded to slowly pull forward.

Motion ¶¶ 11-16, at 9-10 (internal citations omitted).  Mata

disputes the allegations in Defendants' Facts, ¶¶ 11-15, stating that after [Mata] had backed out of his driveway onto the road and had started to inch forward, several

officers started yelling at him and running toward him, and it took a brief second for the command to use his seat belt to register.  He told the officers that he was putting the seat belt on and the car slowly drifted forward a few feet as he was attempting to do so.  Exhibit 1(9853) 20:44:44 to 20:45:12; *see also*, Plaintiff's deposition, Exhibit 2, pp. 236-238.  He also testified that at first he thought they were yelling "stop!" and "you are not free to leave," to the person who was shouting at them.  *Id.* p. 229.  Further, on the tape from the Plaintiff's camera, an individual can be heard telling the officers "he isn't going anywhere, he is going to park at the curb," indicating that it was obvious that the Plaintiff was simply pulling out of the way to buckle his seat belt when he was assaulted by Defendant Rahn.  Exhibit 3, 2:11 min.

Response ¶ 7, at 6.  Although Mata did not submit Exhibit 1, Unit 9853 Dashcam shows that Kee called out "put your seat belt on" twice, but Mata continued to slowly move the vehicle forward, that when Kee and Ahlm ordered Mata to stop his vehicle the vehicle stopped moving forward and Mata yelled "What? I'm gonna put it on, man.  What the hell?" and that after Ahlm stated that he was going to give Mata a ticket and told him that he was not free to leave, Mata responded "Well, I need to go," and the car started slowly moving forward.  Unit 9853 Dashcam at 20:44:40-57.  This evidence thus does not controvert the Officer Defendants' asserted facts; instead, it supports the Officer Defendants' asserted facts.  "While a court considering a summary judgment motion based upon qualified immunity 'usually' must 'adopt[ ] . . . the plaintiff's version of the facts,' that is not true to the extent that there is clear contrary video evidence of the incident at issue."  Thomas v. Durastanti, 607 F.3d 655, 659 (10th Cir. 2010)(quoting Scott v. Harris, 550 U.S. 372, 378-80 (2007)("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")(other citations omitted).  Mata did not submit the portions of Mata's deposition on which he relies, and, even if he did, the dashcam videos clearly show the events as the Officer Defendants depict them.  Although Mata also relies on the Mata Videotape to create an issue of fact, and although the Mata Videotape depicts a person stating "he ain't going nowhere, he's gonna park on the curb," Mata Videotape at 8:41:18-23, this comment was made when the officers were telling Mata to put on his seat belt, before Ahlm told Mata he was going to write him a ticket.  This evidence thus does not controvert the Officer Defendants' assertions that Mata stated "Well, I have to go" and proceeded to slowly pull forward.  Mata also

disputes the allegations in Defendants' Facts ¶¶ 11-15, where the Defendants allege that he cursed and argued with the officers.  From the video of the incident, the officers were overwrought and yelling at the Plaintiff, and their reaction to the incident was far out of proportion with the minor nature of the alleged offense, and invited a sharp response from a citizen who had been treated in such a manner.

Response ¶ 8, at 7 (citing Exhibit 1(9853) at 20:44:44-20:45:12; Mata Deposition 236-238).  Unit 9853 Dashcam depicts Mata uttering profanities, and arguing with the officers regarding whether he was driving.  Mata did not place the portion of his deposition to which he cites in the record.

-10-

Unit 9853 Dashcam at 20:45:08-15; Unit 9844 Dashcam at 20:45:08-11; Unit 10029 Dashcam at 20:45:08-11.  The three police vehicles parked on the street outside Mata's residence confined Mata's ability to move his vehicle.  See Map of Position of Vehicles, filed April 14, 2011 (Doc. 55-2).

Rahn, who was standing several feet to the side of Mata's front wheel, moved back a step as Kee yelled at Mata to "Stop."  Unit 9853 Dashcam at 20:45:10-15; Unit 9844 Dashcam at 20:45:10-15.  See Deposition of Tyler Rahn at 71:1-15 (taken February 23, 2011), filed March 31, 2011 (Doc. 50-3).  Mata did not obey the order to stop, and continued to slowly move his vehicle forward several feet; as Mata moved his vehicle, Rahn reached back and removed his firearm from

---

Mata has thus not directed the Court's attention to evidence in the record controverting the Officer Defendants' asserted facts.

Mata further disputes the allegations in paragraphs 15 and 16 that he "attempted to leave after being told that he was not free to leave."  Response ¶ 9, at 7.  Mata states:

> A viewing of Exhibit 1 (9853) 20:40:10 shows that the officer had turned and was walking away from the Plaintiff when he told him he was "not free to leave."  His words are clipped, and not clear, and his action in walking away is not consistent with an officer about to issue a ticket, and might be misunderstood.  Also, a bystander told the officers that [Mata] was merely pulling to the curb.  Exhibit 3, 2:11 min.  Further, in his deposition the Plaintiff testified that he was not leaving, but pulling to the curb to fasten his seat belt in order to avoid a ticket for improper parking.  *See* Exhibit 2, pp. 229-231, 236.

Response ¶ 9, at 7.  The bystander's statement that Mata was pulling to the curb was made before Ahlm told Mata that he was going to give him a ticket and that he was not free to leave, and before Mata said "well, I have to go," and proceeded to slowly pull forward.  This evidence thus does not controvert the Officer Defendants' asserted facts.  Unit 9853 Dashcam clearly captures Ahlm's statement to Mata that he was not free to leave.  Mata has not included the portions of Mata's deposition to which he cites.  There is thus no evidence in the record that Mata did not understand what Ahlm told him or that he was merely pulling to the curb.  Furthermore, Unit 9853 Dashcam shows that Mata stated "well, I have to go" immediately before slowly pulling forward.  Mata thus has not directed the Court's attention to evidence in the record controverting the Officer Defendants' assertions.  The Court will thus deem the Officer Defendants' assertions admitted.  See D.N.M. LR-Civ. 56.1(b).

the holster, and trained it on Mata, ordering him to stop.  See Unit 9853 Dashcam at 20:45:10-15;

Unit 9844 Dashcam at 20:45:10-15.  As Rahn removed his firearm from the holster, Ahlm was

approximately fifteen feet away standing by his squad car, but he was facing Mata's SUV.

See Ahlm Depo. at 78:7-16, 99:11-21, 100:1-8; Unit 9844 Dashcam at 20:45:09-13; Unit 9853

Dashcam at 20:45:13 (showing Ahlm facing the SUV as Rahn is reaching to pull his firearm out of

its holster).  Once Ahlm heard Kee and Rahn order Mata to stop again, Ahlm moved in behind

Rahn.[6]  See Ahlm Depo. at 99:17-21; Unit 9853 Dashcam at 20:45:10-18.  As Ahlm approached

---

[6] The Officer Defendants assert:

> Officer Rahn, who was standing several feet to the side of Mr. Mata's front wheel,
> moved back a step as Corporal Kee could be head yelling at Mr. Mata to "Stop."  Mr.
> Mata did not obey the order to stop and continued to move his vehicle forward
> several feet as Officer Rahn reached back and removed his firearm from the holster
> and trained it on Mr. Mata, ordering him to stop.  As Officer Rahn removed his
> firearm from the holster, Officer Ahlm had his back turned to Mr. Mata's car and
> was approximately 15 feet standing by his squad car.  Once Officer Ahlm heard
> Corporal Kee and Officer Rahn order Mr. Mata to stop again, Officer Ahlm turned
> back to face the scene and moved in behind Officer Rahn.

Motion ¶¶ 17-20, at 10-11 (internal citations omitted).

Mata disputes the allegations in paragraphs 17 to 20 in the Officer Defendants' Motion, stating that the police officers were acting in an unreasonable and unprofessional manner. See Response ¶ 10, at 7.  He states that his car was moving very slowly after Ahlm turned and walked a few feet, giving no indication he was attempting to flee or speeding up, that a bystander told the police Mata was going to park at the curb, that he testified he was pulling to the curb to fasten his seat belt to avoid a parking ticket, that there were police cars blocking the road to the West -- where his car was headed -- which would make it difficult or impossible to escape in that direction.  See Response ¶ 10, at 7-8 (citing Exhibit 1 at 20:45:10-16; Exhibit 3, 2:11; Mata Depo at 196, 200, 229-231.  The bystander's comment was made before Ahlm told Mata that he was going to give him a ticket and that he was not free to leave.  Although Unit 9853 Dashcam shows that Mata's vehicle was moving slowly, the videotape shows that Rahn ordered Mata to stop, and that Mata did not obey the order and continued to slowly move the vehicle forward.  This evidence thus does not controvert the Officer Defendants' assertions. Mata did not submit the portions of his deposition to which he cites.  Mata thus has not directed the Court's attention to evidence in the record which controverts the Officer Defendants' asserted facts.

Mata also disputes the allegations in paragraphs 18 and 19 in the Officer Defendants' Motion "where the Defendants may intend to imply that . . . Rahn was justified in pointing his firearm at the

Mata's vehicle, Rahn's body blocked Ahlm's view of the driver's side window of Mata's vehicle.

See Unit 9853 Dashcam at 20:5:10-16.  As Ahlm moved in behind Rahn, Kee crossed in front of

_____

Plaintiff and his son because the Plaintiff was attempting to flee," stating that he was blocked by police cars and his car was moving slowly.  Response ¶ 11, at 8 (citing Mata Depo at 196, 200; Rahn Depo at 43).  Mata does not include the portion of his deposition to which he cites.  In Rahn's deposition, Rahn testified that failure to wear a seat belt is a petty misdemeanor and that it is not, based on his training and experience, an arrestable offense.  See Deposition of Tyler Rahn at 43:12-17 (taken February 23, 2011), filed April 14, 2011 (Doc. 55-3).  This testimony does not controvert the Officer Defendants' assertions that Rahn ordered Mata to stop the vehicle, that Mata proceeded to move the vehicle forward, and that Mata then removed his firearm from the holster.  There is, however, some evidence in the record that police cars confined the area in which Mata could more his car -- Unit 9853 was directly behind Mata's driveway, Unit 10029 was West of Mata's driveway on one side of the street, and Unit 9844 was West of Mata's driveway, on the opposite side of the street from Unit 10029.  When Mata pulled his vehicle out of the driveway, he turned the vehicle West and proceeded to slowly move the vehicle West, towards Units 9844 and 10029.  See Map of Position of Cars, filed April 14, 2011 (Doc. 55-2).  The Defendants concede that Mata was maneuvering his vehicle in a confined space.  See Reply to Response to City Defendants' Motion for Partial Summary Judgement No. I *[Docket No. 50]*, filed April 28, 2011 (Doc. 65).  Taking the evidence in the light most favorable to the non-moving party, the Court will accept as true Mata's assertion that he was maneuvering his vehicle in a space confined by the three police vehicles.

Mata also disputes the alleged facts in paragraph 19 of the Officer Defendants' Motion "where the Defendants may claim that Defendant Ahlm was not in a position to protect the Plaintiff from Defendant Rahn's armed assault or to stop the Defendant from pulling his pistol," stating that the dash cam recordings show that Ahlm moved to the side and behind Rahn while he was pointing his pistol at Mata, and that Ahlm made no effort to restrain Rahn, that Ahlm was the first on the scene and the officer who decided to arrest Mata, that Ahlm was in charge of the scene and responsible for the conduct of the officers, and that the officers were agitated out of proportion to the situation, and that Ahlm had a duty to calm the rest of the officers and make sure no one was endangered by an overreaction.  See Response ¶ 12, at 9 (citing Exhibit 1 at 20:45:15, 20:38:20, Exhibit 3 at :55; Mata Depo at 202, Rahn Depo. at 43).  Unit 9853 Dashcam shows that Ahlm's back was not turned when Rahn removed his firearm from the holster.  See Unit 9853 Dashcam 20:45:13.  Because the Court must construe the evidence in the light most favorable to the non-moving party, see Hunt v. Cromartie, 526 U.S. at 551, the Court will accept as true Mata's version of the fact that the dash cam recordings show that Ahlm saw Rahn pull out his firearm and moved to the side and behind Rahn while Rahn was pointing his firearm at Mata, and made no effort to restrain Rahn.  Mata's assertions that Ahlm was in charge and responsible for the conduct of the officers is a legal argument.  The Court thus will not accept these assertions as true factual statements, but will address them in its legal analysis.

-13-

Ahlm's path to position himself to one side of Rahn.[7]  See Ahlm Depo. at 100:9-15; Unit 9853 Dashcam at 20:45:12-15.

Videotape of the incident does not clearly show where Rahn's firearm was trained; however, as Mata stopped his vehicle, the flashlight at the end of Rahn's firearm can be seen shining on the lower portion of the driver's side window.  See Unit 9853 Dashcam at 20:45:12-19.  Although the videotape does not clearly show where Rahn had his firearm trained during this incident, Mata's minor son, J.A.M., who was traveling in the front passenger seat of the vehicle at the time, may have been in the line of fire had Rahn fired his gun; J.A.M. testified that Rahn pointed the gun at his father, but that the gun was "sort of" pointing at him as well in that -- "if it would have shot my dad, it would have shot me, too."  Deposition of J.A.M. at 10:18-23, 11:10-18 (taken February 3, 2011),

---

[7] The Officer Defendants assert that, as Ahlm approached Mata's vehicle, Rahn's body blocked Ahlm's view of the driver's side window of Mata's vehicle and that, as Ahlm moved in behind Rahn, Kee crossed in front of Ahlm's path to position himself to one side of Rahn. See Motion ¶¶ 21-22, at 11 (citations omitted).  Mata disputes the alleged facts in paragraphs 21 and 22 of the Officer Defendants' Motion "where the Defendants may claim that Defendant Ahlm was not in a position to protect the Plaintiff from Defendant Rahn's armed assault or to stop the Defendant from pulling his pistol," stating that the dash cam recordings show that Ahlm moved to the side and behind Rahn while he was pointing his pistol at Mata, and made no effort to restrain Rahn, that Ahlm was the first on the scene and the officer who decided to arrest Mata, that Ahlm was in charge of the scene and responsible for the conduct of the officers, and that the officers were agitated out of proportion to the situation, and that Ahlm had a duty to calm the rest of the officers and make sure no one was endangered by an overreaction. See Response ¶ 12, at 9 (citing Exhibit 1 at 20:45:15, 20:38:20, Exhibit 3 at :55; Mata Depo at 202, Rahn Depo. at 43).  Mata has not submitted the portions of his deposition to which he cites.  In his deposition, Rahn testified that he could hear Kee shouting at Mata to put his seatbelt on.  See Rahn Depo. at 42:24-43:11.  This testimony does not controvert the Officer Defendants' asserted facts.  Mata's argument that it was Ahlm's duty to calm the officers is a legal argument, which the Court will not accept as undisputed facts, but will address in its legal analysis.  Unit 9853 Dashcam shows that, as Ahlm approached Mata's vehicle, Rahn's body blocked Ahlm's view of the driver's side window.  See Unit 9853 Dashcam at 20:45:12-16.  This evidence thus does not controvert the Officer Defendants' asserted facts.  Because Mata has not directed the Court's attention to evidence in the record controverting the Officer Defendants' asserted facts, the Court will deem the Officer Defendants' asserted facts admitted.  See D.N.M. LR-Civ. 56.1(b).

filed March 31, 2011 (Doc. 50-4).  Mata's mother, who was standing alongside the passenger side

of the vehicle and facing in towards the interior of the vehicle at the time when Rahn pulled out his

firearm, testified that Rahn did not point his firearm at Mata's minor son, J.A.M.[8]  See Deposition

of Gregoria Mata at 23:21-24:9 (taken February 2, 2011), filed March 31, 2011 (Doc. 50-5)(stating

that the police pointed the gun only at Mata and that the officer did not point the gun at J.A.M.).

Mata's minor daughter, G.M. was not a passenger in Mata's vehicle at the time of the

---

[8] The Officer Defendants assert:

> Videotape of the incident does not clearly show where Officer Rahn's firearm was trained; however, as Mr. Mata stopped his vehicle, the flashlight at the end of Officer Rahn's firearm can be seen shining on the lower portion of the driver's side window. Although the videotape does not clearly show where Officer Rahn had his firearm trained during this incident, Mr. Mata's minor son, J.A.M., who was traveling in the front passenger seat of the vehicle at the time, testified that Officer Rahn did not train the firearm on him.  Mr. Mata's mother, who was standing alongside the passenger side of the vehicle and facing in towards the interior of the vehicle at the time when Officer Rahn pulled out his firearm, also testified that Officer Rahn did not point his firearm at Mr. Mata's minor son, J.A.M.

Motion ¶¶ 23-25, at 11 (internal citations omitted).  Mata disputes the allegations in paragraphs 23 to 25 of the Officer Defendants' Motion

> where the Defendants may allege that the firearm aimed by . . . Rahn was not pointed at [Mata's] minor son.  The video evidence leaves no doubt that the firearm was pointed directly at the Plaintiff's head.  Also, in his deposition, . . . Ahlm claims that at the time . . . Mata started to go forward and he approached the car, [Mata's] son was standing unrestrained in the front seat of the truck. . . . If he was standing in the seat of the truck that would place the child directly behind the Plaintiff in relation to the firearm pointed at [Mata's] head, and in the line of fire if . . . Rahn fired the weapon, either purposefully or accidentally.

Response ¶ 13, at 9-10 (citing Exhibit 1; Ex. 3; Ahlm Depo. at 74-76).  In his deposition, Ahlm testified that J.A.M. was not restrained in the front seat.  See Deposition of John Ahlm at 76:1-24 (taken February 24, 2011), filed April 14, 2011 (Doc. 55-4).  The dashcam videos show Rahn pointing the firearm into the low portion of the driver's side window.  See Unit 9853 Dashcam at 20:45:15.  Taking facts in light most favorable to Mata, see Hunt v. Cromartie, 526 U.S. at 551, the Court will accept as true Mata's version of the facts that J.A.M., who was in front seat, may have been in line of fire had Rahn fired his gun.

incident; she was, however, standing in her front yard at the time.  See Deposition of G.M. at 6:4-8, 10:16-21 (taken February 3, 2011), filed March 31, 2011 (Doc. 50-6); G. Mata Depo. at 18:21-19:2. Videotape from the scene shows that Mata's front yard is bounded on the side that faces Sycamore Street by a fence with a hedge growing over it.  See Unit 9844 Dashcam at 20:45:09.  Videotape from the scene shows that Mata's mother was standing alongside the front passenger-side door of Mata's vehicle when Rahn pulled his firearm on Mata and that she turned forward to keep pace with the vehicle as it continued to move forward, and then turned back and leaned in to the front passenger-side window as the vehicle came to a stop.[9]  See Unit 9844 Dashcam at 20:45:11-20.

---

[9] The Officer Defendants assert:

> Mr. Mata's minor daughter, G.M., was not a passenger in Mr. Mata's vehicle at the time of the incident; however, she was standing in her front yard at the time. Videotape from the scene shows that Mr. Mata's front yard is bounded on the side that faces Sycamore Street by a fence with a hedge growing over it. Videotape from the scene shows that Mr. Mata's mother, Gregoria Mata, was standing alongside the front passenger-side door of Mr. Mata's vehicle when Officer Rahn pulled his firearm out on Mr. Mata and that she turned forward to keep pace with the vehicle as it continued to move forward, and then turned back and leaned in to the front passenger-side window as the vehicle came to a stop.

Motion ¶¶ 26-28, at 12 (internal citations omitted).

> Mata disputes the allegations in paragraphs 26 through 28 of the Officer Defendants' Motion where the Defendants may allege that the Plaintiff's daughter was not in a position to see the events where her father and brother were threatened by Defendant Rahn and his pistol. The view from Defendant Rahn's dash camera is not clear as to where the daughter was standing or how much she could see. The hedge mentioned by the Defendants appears to be shoulder high or so in relation to the Plaintiff's wife. However, none of the videos show how thick the hedge is or if it can been seen through, or if the daughter was standing in a place where she could see. Further, if the white flashes in the yard shown on the recording is the daughter, she was standing only a few feet from her father's car and undoubtedly heard the references to the firearm and her brother's screams.

Response ¶ 14, at 10 (citing Exhibit 1(Unit 9844)).  Unit 9844 Dashcam shows a fence with a hedge growing on it.  See Unit 9844 Dashcam at 20:45:52.  Mata has not directed the Court's attention to

Approximately eleven seconds elapsed from the time that Rahn pulled out his firearm and ordered Mata to stop until the time that he re-holstered the firearm, and Kee moved in to extract Mata from the car.[10]  See Unit 9853 Dashcam at 20:45:12-22.

## PROCEDURAL BACKGROUND

On April 15, 2010, Mata filed his Complaint for Civil Rights Violations.  See Doc. 1.  In the Complaint, Mata alleges claims under 42 U.S.C. § 1983.  In Count I, he alleges that Rahn unlawfully used excessive force in violation of the Fourth Amendment.  In Count II, he alleges that Rahn's fellow officers failed to take action to stop Rahn's excessive use of force.  In Count III, he asserts a claim for punitive damages.  In Count IV, he asserts that the City of Farmington is liable, because the "acts and omissions in violation of Plaintiffs' rights by the Defendant Rahn were perpetrated pursuant to the custom and policy of the City of Farmington," and that the City of Farmington maintains an official policy of permitting its officers to engage in harassing behavior and excessive use of force or ignores such actions.  Complaint ¶¶ 58-59, at 12-13.  In Count V, he asserts that the City of Farmington is liable, because the "acts and omissions in violation of Plaintiffs' rights by Defendant Rahn were perpetrated pursuant to the custom and policy of the City of Farmington," and

_____

evidence that controverts the Officer Defendants' asserted facts.  The Court will thus deem the Officer Defendants' asserted facts admitted.  See D.N.M. LR-Civ. 56.1(b).

[10] The Officer Defendants assert: "Approximately 10 seconds elapsed from the time that Officer Rahn pulled out his firearm and ordered Mr. Mata to stop until the time that he re-holstered the firearm, as Corporal Kee moved in to extract Mr. Mata from the car."  Motion ¶ 29, at 12.  Mata disputes this allegation, asserting that the entire incident "took about seven (7) seconds, and in any event, does not establish the absence or presence of a genuine dispute in any event."  Motion ¶ 15, at 10-11.  The Dashcam videos show Rahn beginning to pull out his firearm at 20:45:12.  See, e.g., Unit 9853 Dashcam at 20:45:12.  The Dashcam videos reflect a time of 20:45:23 when Kee reaches to open Mata's car door.  See, e.g., Unit 9853 Dashcam at 20:45:23.  Thus, eleven seconds approximately elapsed.  The Court will thus adjust the Defendants' asserted fact to reflect that approximately eleven seconds elapsed from the time that Rahn pulled out his firearm until Kee moved in to extract Mata from the car.

the City of Farmington failed to train or supervise Rahn regarding the appropriate handling of situations.  Complaint ¶ 65, at 13-14.  In Count VI, Mata alleges that the City of Farmington is liable for its failure to train and supervise with reference to the officers' duty to intervene and stop the use of excessive force by a fellow officer.

On March 31, 2011, Rahn and Ahlm filed the City Defendants' Motion for Partial Summary Judgment No. I: Motion by Officers Rahn and Ahlm for Qualified Immunity on Excessive Force and Failure to Intervene Claims in Counts I and II.  See Doc. 50.  They argue that Rahn is entitled to qualified immunity on Count I and that Ahlm is entitled to qualified immunity on Count II.  The Officer Defendants argue that the decision to display a firearm as a show of force at a traffic stop and the decision not to intervene in a fellow officer's show of force are the sort of discretionary decisions that qualified immunity is designed to shield.  Rahn argues that he is entitled to qualified immunity on Mata's excessive force claims, because Mata fails to allege or show that his minor children were seized for purposes of a Fourth-Amendment excessive force claim, because Mata fails to show that Rahn's display of force was so unreasonable and excessive as to constitute a violation of the Fourth Amendment, and because the clearly established weight of legal authority does not hold that Rahn's show of force was unconstitutional.  Ahlm argues that he is entitled to qualified immunity on Count II, because Mata has failed to show that Ahlm witnessed a constitutional violation, which is a necessary predicate to a failure to intervene claim, and because a videotape shows that Ahlm did not have a realistic opportunity to intervene.  The Officer Defendants thus request that the Court dismiss the individual capacity claims against Rahn and Ahlm with prejudice.

On April 14, 2011, Mata filed the Plaintiffs' Response to City Defendants' Motion for Partial Summary Judgment No. I: Motion by Officers Rahn and Ahlm for Qualified Immunity on Excessive Force and Failure to Intervene Claims in Counts I and II.  See Doc. 55.  Mata argues that his minor

children were seized by the FPD officers as that term is used under the Fourth Amendment.  He argues that Rahn used excessive force.  He also argues that Rahn's use of force was unconstitutional. Mata further argues that Ahlm is not entitled to qualified immunity and that he was obligated to intervene.

On April 22, 2011, the Officer Defendants filed the Motion to Strike Certain References in Plaintiffs' Response to City Defendants' Motion for Partial Summary Judgment No. I *[Docket No. 55]*.  See Doc. 62.  They argue that Mata devotes six pages of his response to various encounters he had with officers of the FPD between 2002 through 2010.  They argue that these encounters are not relevant.  They argue that the Court has the inherent power to strike impertinent filings and to rein in abusive conduct.  They thus ask the Court to strike all references to encounters between Mata and FPD officers that predate or postdate his June 16, 2008 traffic stop, and to strike Mata's responses to paragraphs 16 to 19 of the Officer Defendants' Motion to the asserted undisputed facts as they are irrelevant.

On April 28, 2011, Rahn and Ahlm filed their Reply to Response to City Defendants' Motion for Partial Summary Judgment No. I *[Docket No. 50]*.  See Doc. 65.  The Defendant Officers argue that Rahn did not subject J.A.M. and G.M. to a show of authority.  They argue that Rahn's show of force was not unreasonable.  They further argue that Mata misapprehends the case law on the failure-to-intervene claims.

At the hearing, the Court indicated that it was inclined to address the two motions in one Memorandum Opinion and Order, that it was inclined to not strike Mata's allegations, and that it was inclined to make a determination whether the allegations were material in the body of its opinion.  Mata's counsel represented that he agreed with the Court's inclination to not strike the allegations and to determine whether they are material in its analysis.  Mata's counsel represented

that he did not want to file a written response to the Officer Defendants' motion to strike; instead, he wished to stand on the record.

At a pre-trial hearing on June 1, 2011, the Court informed Mata's counsel that Mata had not submitted Exhibits 1 or 3 in support of his Response, and that he had not submitted portions of his deposition.  Mata's counsel informed the Court that he did not intend to file the exhibits or the excerpts of the deposition, and stated that the Court should rule on the record before it.

## LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Rule 56(c) states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case."  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record], together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.")(internal quotation marks omitted).  Once the movant meets this burden, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To survive summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary

judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539.  Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improv. Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (internal citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Third, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  Qualified immunity "protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of

Albuquerque, No. Civ. 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."  Pearson v. Callahan, 129 S. Ct. 808, 815 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 129 S. Ct. at 815 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden."  Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001).  The plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged unlawful activity.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009); Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  In assessing whether the right was clearly established, the court asks whether the right was sufficiently clear that a reasonable officer in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d at 1327.  In Saucier v. Katz, 533 U.S. 194 (2001), overruled in part by Pearson v. Callahan, the Supreme Court of the United States held that the court must decide whether there was a constitutional violation first before it decides whether the law is clearly established.  See 533 U.S. at 200-01.  Courts are no longer required to analyze the issues in that order.  See Pearson v. Callahan, 129 S. Ct. at 818.  "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment -- showing 'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'"  Nelson v. McMullen, 207 F.3d 1202, 1206 (10th Cir. 2000).

-23-

1.      **Factual Disputes in the Qualified-Immunity Analysis.**

In determining whether the plaintiff has met his or her burden of establishing a constitutional

violation that was clearly established, the court construes the facts in the light most favorable to the

plaintiff as the non-moving party.  See Scott v. Harris, 550 U.S. 372, 378-80 (2007); Riggins v.

Goodman, 572 F.3d at 1107 (noting that the United States Court of Appeals for the Tenth Circuit

"accept[s] the facts and the plaintiff alleges them").  In Thomson v. Salt Lake County, 584 F.3d

1304 (10th Cir. 2009), the Tenth Circuit explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation,
> a plaintiff's version of the facts must find support in the record: more specifically,
> "[a]s with any motion for summary judgment, when opposing parties tell two
> different stories, one of which is blatantly contradicted by the record, so that no
> reasonable jury could believe it, a court should not adopt that version of the facts[.]"
> York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott [v.
> Harris], 550 U.S. at 380); see also Estate of Larsen ex. rel Sturdivan v. Murr, 511
> F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake County, 584 F.3d at 1312.  "The Tenth Circuit, in Rhoads v. Miller,

No. 08-8093, 2009 U.S. App. LEXIS 24312 (10th Cir. Nov. 5, 2009), explained that the blatant

contradictions of the record must be supported by more than other witnesses' testimony[.]" Lymon

v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.).

> In evaluating a motion for summary judgment based on qualified immunity, we take
> the facts "in the light most favorable to the party asserting the injury."  Scott v.
> Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's
> version of the facts," id. at 378, unless that version "is so utterly discredited by the
> record that no reasonable jury could have believed him," id. at 380.  In Scott, the
> plaintiff's testimony was discredited by a videotape that completely contradicted his
> version of the events.  550 U.S. at 379.  Here, there is no videotape or similar
> evidence in the record to blatantly contradict Mr. Rhoads' testimony.  There is only
> other witnesses' testimony to oppose his version of the facts, and our judicial system
> leaves credibility determinations to the jury.  And given the undisputed fact of injury,
> Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not
> its admissibility. . . . Mr. Rhoads alleges that his injuries resulted from a beating
> rendered without resistence or provocation.  If believed by the jury, the events he
> describes are sufficient to support a claim of violation of clearly established law

under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 2009 U.S. App. LEXIS 24312, *6-8 (internal citations and quotations omitted).

See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x

at 291-92).  In a concurring opinion in Thomson v. Salt Lake County, Judge Holmes stated that the

court must focus first on the legal question of qualified immunity and "determine whether plaintiff's

factual allegations are sufficiently grounded in the record such that they may permissibly comprise

the universe of facts that will serve as the foundation for answering the legal question before the

court" before inquiring into whether there are genuine issues of material fact for resolution by the

jury.  584 F.3d at 1326-27 (Holmes, J. concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770

(11th Cir. 1988)(Johnson, J., dissenting)(observing that, even if factual disputes exist, "these

disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity

of the plaintiffs' facts.")).

## 2.      Clearly Established Rights.

A clearly established right is generally defined as a right so thoroughly developed and

consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned."

Zweibon v. Mitchell, 720 F.2d 162, 172-173 (D.C. Cir. 1983), cert. denied, 469 U.S. 880 (1984).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth

Circuit decision on point, or the clearly established weight of authority from other courts must have

found the law to be as the plaintiff maintains."  Strepka v. Miller, Nos. 00-1294, 00-1389, 2001 WL

1475058, at * 5 (10th Cir. 2001)(citing Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).  See

Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  "In determining

whether the right was 'clearly established,' the court assesses the objective legal reasonableness of

the action at the time of the alleged violation and asks whether 'the contours of the right [were]

sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). The Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. at 640. However, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 635.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified-immunity defense. In Pearson v. Callahan, the Supreme Court held that, "while the sequence set forth [in Saucier v. Katz] is often appropriate, it should no longer be regarded as mandatory." 129 S. Ct. at 818. Rather, lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." Id. The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz would often be beneficial. See Pearson v. Callahan, 129 S. Ct. at 819. Once the plaintiff has established the inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails. See Cannon v. City and County of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

## LAW REGARDING EXCESSIVE FORCE

When an officer moves for qualified immunity on an excessive-force claim, "a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)." Cortez v. McCauley, 478 F.3d 1108, 1128 (10th Cir. 2007).

Courts analyze Fourth-Amendment excessive force claims "under the 'objective reasonableness' standard that governs other Fourth Amendment inquiries." Cordova v. Aragon, 569 F.3d 1183, 1188 (10th Cir. 2009). See Graham v. Connor, 490 U.S. 386, 395 (1989)("[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."). The Tenth Circuit has explained:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Weigel v. Broad, 544 F.3d 1143, 1151-52 (10th Cir. 2008)(internal quotation marks and citations omitted).

The court assesses "objective reasonableness based on whether the totality of the circumstances justified the use of force, and pay careful attention to the facts and circumstances of the particular case." Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1260 (10th Cir. 2008)(internal quotation marks omitted). See Cordova v. Aragon, 569 F.3d at 1188 (describing the reasonableness test as requiring a court to "slosh our way through the fact-bound morass of reasonableness" by "conducting [a] balancing act")(internal quotation marks omitted). Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. at 396.

## ANALYSIS

The Court will deny the Officer Defendants' motion to strike. The Court will not strike the references in Mata's response, because this drastic remedy is generally disfavored, and the Court

does not believe that it is necessary in this situation.  The Court will grant in part and deny in part the Officer Defendants' motion for partial summary judgment.  The Court finds that Rahn is entitled to qualified immunity on Mata's excessive force claim on G.M.'s behalf, but that he is not entitled to qualified immunity on Mata's excessive force claims on his own behalf and on J.A.M.'s behalf. Mata cannot show that Rahn's conduct violated G.M.'s constitutional rights, because G.M. was not seized.  The Court will thus grant summary judgment for Rahn against Mata's excessive force claim on G.M.'s behalf on the grounds of qualified immunity.  A reasonable jury could find, however, that Rahn's conduct violated Mata's and J.A.M.'s Fourth Amendment rights.  The Court finds that these rights were clearly established at the time of the alleged violation.  Because a reasonable jury could find that Rahn's conduct violated Mata's and J.A.M.'s Fourth-Amendment rights, Rahn is not entitled to judgment as a matter of law, and the Court will deny his request for summary judgment on Mata's excessive force claims on his behalf and on J.A.M.'s behalf on the grounds of qualified immunity.  The Court finds that Ahlm is entitled to qualified immunity on Mata's failure to intervene claim on G.M.'s behalf, because Mata cannot show that Rahn violated G.M.'s constitutional rights and establishing a constitutional violation is a necessary predicate to any claim that an officer failed to intervene.  The Court further finds that Ahlm is not entitled to qualified immunity on Mata's failure-to-intervene claims on his behalf and on J.A.M.'s behalf, because there is an issue of fact whether Ahlm had a realistic opportunity to intervene to prevent Rahn's alleged excessive use of force.

## I.    <u>THE COURT WILL NOT STRIKE REFERENCES IN MATA'S RESPONSE.</u>

The Court will not strike the allegations in Mata's Response.  The Officer Defendants argue that the Court has the inherent power to strike impertinent filings.  They argue that Mata's references are irrelevant to the issues before the Court and that the Response does not conform to the local rules

regarding summary judgment procedures.

The Court has recently proposed amendments to D.N.M.LR-Civ 56.1(b) that will require the party responding to the motion for summary judgment to number any additional facts, and the party moving for summary judgment to specify whether the additional facts are disputed or not in its reply. A "redline" version of the proposed revisions to the Local Rules of Civil Procedure of the United States District Court for the District of New Mexico is currently available on the Court's website at www.nmcourt.fed.us. The proposed revisions were posted for public comment. The period for public comment closed November 24, 2010. The Court will now consider the comments and further revisions, as necessary. The proposed version of D.N.M.LR-Civ 56.1(b) states:

> The Memorandum must set out a concise statement of all of the material facts as to which the movant contends no genuine issue exists. The facts must be numbered and must refer with particularity to those portions of the record upon which the movant relies.
>
> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted. <u>The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.</u>
>
> <u>The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection. Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact. All material facts set forth in the Response will be deemed undisputed unless specifically controverted.</u>

Proposed revisions to D.N.M.LR-Civ. 56.1(b)(emphasis added). The Court's proposed rule 56.1(b) addresses additional proposed facts in a response to a motion for summary judgment. It appears that

Mata was attempting to assert additional undisputed facts, and, as demonstrated by the Court's

proposed rule 56.1(b), this format is not out of line with the Court's summary judgment procedures.

Rule 12(f) of the Federal Rules of Civil Procedure states:

**(f) Motion to Strike.** The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:

(1) on its own; or

(2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Fed. R. Civ. P. 12(f). "The rule does not require that a movant show prejudice and the advisory

committee notes do not contemplate such a requirement." Lane v. Page, 272 F.R.D. 581, 598

(D.N.M. 2011)(Browning, J.). The Court has stated that it agrees with the United States Court of

Appeals for the Ninth Circuit, which does not require movants to show prejudice, "that it should not

add a requirement that the drafters did not place there, and that the Supreme Court and Congress did

not ratify." Lane v. Page, 272 F.R.D. at 600.

This Court has noted:

"Striking a pleading or part of a pleading is a 'drastic remedy and because a motion to strike may often be made as a dilatory tactic, motions to strike under Rule 12(f) generally are disfavored.'" Sai Broken Arrow C, LLC v. Guardian Emergency Vehicles, Inc., No. 09-CV0455-CVE-FHM, 2010 WL 132414, at *5 (N.D.Okla. Jan. 8, 2010)(quoting Burget v. Capital W. Sec., Inc., 2009 WL 4807619, *1 (W.D.Okla. Dec.8, 2009)). "Allegations will not be stricken as immaterial under this rule unless they have no possible bearing on the controversy." Sai Broken Arrow C, LLC v. Guardian Emergency Vehicles, Inc., 2010 WL 132414, at *5 (quoting Bd. of County Comm'rs of the County of La Plata, Colo. v. Brown Group Retail, Inc., Civ. No. 08-CV-00855-LTB, 2009 WL 2514094, at *2 (D.Colo. Aug. 14, 2009)); Roderick Revocable Living Trust v. XTO Energy, Inc., No. 08-1330-JTM, 2009 WL 603641, at *2 (D.Kan. Mar. 9, 2009)("A motion to strike will usually be denied unless the allegations have no possible relation to the controversy and may prejudice one of the parties.")(quoting Miller v. Pfizer, Inc., No. Civ. A. 99-2326-KHV, 1999 WL 1063046, at *3 (D.Kan. Nov. 10, 1999)).

Lane v. Page, 727 F. Supp. 2d 1214, 1224 (D.N.M. 2010)(Browning, J.).

The issues before the Court are whether Rahn's actions were objectively reasonable in light of the facts and circumstances "without regard to their underlying intent or motivation," Graham v. Connor, 490 U.S. at 397, and whether Ahlm had a realistic opportunity to intervene, see Hall v. Burke, 12 F. App'x 856, 861 (10th Cir. 2001).  Although Mata's allegations may not, in and of themselves, create a genuine issue of fact precluding summary judgment, the Court will consider the factual allegations as factual background, because it cannot say that the allegations have no possible bearing on the controversy before it.  For example, Mata's allegations that his family had a contentious relationship with FPD and that his family felt persecuted relates to his damages for emotional distress.[11]  The Court thus will not employ the drastic remedy of striking a portion of a pleading, and it will not strike Mata's allegations.  Instead, it will include Mata's allegations as a factual background for the incident which gave rise to this litigation.

## II.    RAHN IS ENTITLED TO QUALIFIED IMMUNITY ON MATA'S EXCESSIVE FORCE CLAIM ON G.M.'S BEHALF, BUT HE IS NOT ENTITLED TO QUALIFIED IMMUNITY ON MATA'S EXCESSIVE FORCE CLAIMS ON HIS OWN BEHALF AND ON JA.M.'S BEHALF.

The Officer Defendants argue that Rahn is entitled to qualified immunity on the claim that he used excessive force against Mata and his minor children when he stopped Mata's vehicle from

---

[11] The Officer Defendants have filed two motions in limine: (i) Defendant Officers' Motion in Limine No. I: The Exclusion of Evidence at Trial Regarding Defendant Officers' Use of Force in Prior and Subsequent, Unrelated Incidents, Police Standard Operating Procedures, Training, and Less Intrusive Alternatives, filed May 4, 2011 (Doc. 67); and (ii) Defendant Officers' Motion in Limine No. II: Admissibility of Evidence of Plaintiff's Interactions with the Farmington Police Department, Other Arrests and Violent Encounters to Rebut His Claim for Damages, filed May 5, 2011 (Doc. 68).  The Court heard argument on these motions at the pre-trial conference on June 1, 2011.  The Court stated that it was inclined to allow limited testimony regarding the alleged strained relationship between the Mata family and the FPD, and the alleged persecution to set a context for this incident.

leaving the scene of a traffic stop by drawing his firearm.  They argue that Mata cannot present an excessive force claim on behalf of either of his children, because it is undisputed that they were never seized during the incident and that seizure is a prerequisite to an excessive force claim.  The Officer Defendants argue that, while Mata can show that Rahn effectively seized him, he cannot show that the manner in which Rahn accomplished the seizure was objectively unreasonable.  The Officer Defendants argue that Tenth Circuit caselaw does not hold now, nor did it hold then, that it would be clearly unreasonable for an officer to make a show of force to stop a vehicle under such circumstances.  The Officer Defendants also argue that there does not appear to be caselaw from other circuits that would put Rahn on notice that his show of force was patently unconstitutional. They argue that Mata thus cannot satisfy his burden under the qualified immunity test and show that Rahn's actions violated a clearly established constitutional right.

Mata argues that he and his children were seized within the meaning of the term under the Fourth Amendment.  He argues that Rahn used excessive force, because his actions were not objectively reasonable in the circumstances.

The Court finds that Rahn is entitled to qualified immunity on Mata's excessive force claim on G.M.'s behalf, because G.M. was not seized.  See Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1187 n.9 (citations omitted).  Mata thus cannot show that Rahn's conduct violated G.M.'s constitutional rights.  See Thomas v. Durastanti, 607 F.3d at 663.  The Court will therefore grant summary judgment for Rahn against Mata's excessive force claim on G.M.'s behalf on the grounds of qualified immunity.  See Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001)("If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." (citation omitted)).  The Court further finds that Rahn is not entitled to qualified immunity on Mata's excessive force claims on his own behalf and on J.A.M.'s behalf.  A reasonable

jury could find that Rahn's conduct violated Mata's and J.A.M.'s Fourth-Amendment rights. See Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1192-93. The Court finds that these rights were clearly established at the time of the alleged violation. See Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1196-97. Because a reasonable jury could find that Rahn's conduct violated Mata's and J.A.M.'s clearly established Fourth-Amendment rights, Rahn is not entitled to judgment as a matter of law, and the Court will deny his request for summary judgment on Mata's excessive force claims on his behalf and on J.A.M.'s behalf on the grounds of qualified immunity. See Nelson v. McMullen, 207 F.3d at 1206.

### A.    RAHN DID NOT SEIZE G.M.

The Officer Defendants argue that G.M. was not seized, because it is undisputed that she was not in her father's vehicle at the time of the incident. They argue that Rahn is thus entitled to qualified immunity. Mata argues that G.M. was seized, because the police restricted her movements. He argues that the police told the entire family to stay on the property and not to interfere with the traffic stop of the driver in the SUV. He further argues that a reasonable child of G.M.'s age would have believed she was restrained from leaving the property.

"To state an excessive force claim 'under the Fourth Amendment, plaintiffs must show *both* that a 'seizure' occurred and that the seizure was 'unreasonable.'" Thomas v. Durastanti, 607 F.3d at 663 (citing Childress v. City of Arapaho, 210 F.3d 1154, 1156 (10th Cir. 2000); Brower v. County of Inyo, 489 U.S. 593, 599 (1989)). See Flores v. City of Palacios, 381 F.3d 391, 396 (5th Cir. 2004)("To bring a § 1983 excessive force claim under the Fourth Amendment, a plaintiff must first show that she was seized." (citing Graham v. Connor, 490 U.S. at 388)). An officer seizes a person when he, "by means of physical force *or* show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 20 n.16 (1968). The "governmental termination of freedom

-33-

of movement" must be made "*through means intentionally applied*." Brower v. County of Inyo, 489

U.S. at 596-97 (emphasis in original).

> One's freedom of movement is terminated "if, in view of all the circumstances
> surrounding the incident, a reasonable person would have believed that he was not
> free to leave," and the police have applied physical force, however slight, or the
> person has submitted to a show of authority by the police.

Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1187 n.9 (citations omitted).

Rahn did not seize G.M. In the Complaint, Mata alleges excessive force claims only against

Rahn. He does not allege that the other officers whom he sued used excessive force; he only

contends that they failed to stop Rahn's use of excessive force. The videotape shows that Ahlm, not

Rahn, told the occupants of Mata's residence to stay in their front yard and to not interfere with the

traffic stop. See Unit 9853 Dashcam at 20:40:02-20. Rahn's only command issued to any of the

gathered individuals was a command to stop using profanities. See Unit 9844 Dashcam at 20:44:11-

19; Mata Videotape at 8:40:48-8:41:04. Moreover, the dashcam videos show that FPD officers

made no effort to restrict the movements of G.M.'s grandmother, who was walking along the

sidewalk in front of the Mata home as the incident unfolded, nor did they try to keep J.A.M. from

leaving the sidewalk in front of his property and getting in his father's vehicle. See Unit 9853

Dashcam at 20:43:56-20:44:14; Unit 9844 Dashcam at 20:44:48. Mata's minor daughter, G.M. was

not a passenger in Mata's vehicle at the time of the incident; Rahn did not train his firearm on her.

See G.M. Depo. at 6:4-8, 10:16-21; G. Mata Depo. at 18:21-19:2. There is no evidence Rahn

interacted with her in any way or engaged in show of authority to restrain her movements. Under

these circumstances, Rahn did not intentionally terminate G.M.'s freedom of movement.

See Brower v. County of Inyo, 489 U.S. at 596-97. G.M. thus was not seized. The Court does not

need to proceed to analyze the excessive force claim involving G.M., because G.M. cannot show

that Rahn's conduct violated a constitutional right.  See Saucier v. Katz, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."); McCormick v. City of Lawrence, 325 F. Supp. 2d 1191, 1205 (D. Kan. 2004)(" Because the court has determined that no constitutional violation occurred, there is no need to proceed to the second prong of the qualified immunity analysis.").  The Court will thus grant summary judgment for Rahn on Mata's claims on G.M.'s behalf on the grounds of qualified immunity.  See Medina v. Cram, 252 F.3d at 1128 ("If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." (citation omitted)).

### B.    RAHN SEIZED J.A.M.

The Officer Defendants argue that, while J.A.M. was in the front passenger seat of his father's vehicle at the time of the incident, he was not seized, because it is undisputed that Rahn did not train his firearm on him, and because there is no evidence that Rahn applied any force to J.A.M. no matter how slight, or issued any commands to him to get him to submit to police authority.  They argue that Rahn is thus entitled to qualified immunity.  The Defendants argue that, even if the Court were to find that J.A.M. submitted to the show of authority that was directed at his father, Rahn's show of force against Mata was objectively reasonable under the circumstances.

Mata argues that J.A.M. was seized, because he was in the vehicle with his father who was "being held at gunpoint and being told to stop the car."  Response at 16.  He argues that J.A.M. undoubtedly believed he was not free to leave and that a reasonable seven-year-old would not believe he was free to leave the scene in the circumstances.

The Supreme Court has stated:

A traffic stop necessarily curtails the travel a passenger has chosen just as much as

-35-

> it halts the driver, diverting both from the stream of traffic to the side of the road, and
> the police activity that normally amounts to intrusion on "privacy and personal
> security" does not normally (and did not here) distinguish between passenger and
> river.

Brendlin v. California, 551 U.S. 249, 257 (2007).  Mata, however, is not challenging the legality of

the traffic stop on J.A.M.'s behalf.  Mata thus must demonstrate that there was a governmental

termination of J.A.M.'s freedom of movement through means intentionally applied.  See Brower v.

County of Inyo, 489 U.S. at 596-97.

> One's freedom of movement is terminated "if, in view of all the circumstances
> surrounding the incident, a reasonable person would have believed that he was not
> free to leave," and the police have applied physical force, however slight, or the
> person has submitted to a show of authority by the police.

Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1187 n.9 (citations omitted).  As the Supreme

Court has observed: "A police officer may make a seizure by a show of authority and without the

use of physical force, but there is no seizure without actual submission; otherwise, there is at most

an attempted seizure, so far as the Fourth Amendment is concerned."  Brendlin v. California, 551

U.S. at 254.

A reasonable child would not have felt free to leave in the circumstances.  Videotape of the

incident does not clearly show where Rahn's firearm was trained; however, as Mata stopped his

vehicle, the flashlight at the end of Rahn's firearm can be seen shining on the lower portion of the

driver's side window.  See Unit 9853 Dashcam at 20:45:12-19.  Although the videotape does not

clearly show where Rahn had his firearm trained during this incident, Mata's minor son, J.A.M.,

who was traveling in the front passenger seat of the vehicle at the time, testified that Rahn pointed

the gun at his father, but that the gun was "sort of" pointing at him as well in that -- "if it would have

shot my dad, it would have shot me, too." J.A.M. Depo. at 10:18-23, 11:10-18. Mata's mother, who

was standing alongside the passenger side of the vehicle and facing in towards the interior of the

-36-

vehicle at the time when Rahn pulled out his firearm, testified that Rahn did not point his firearm at Mata's minor son, J.A.M, <u>see</u> G. Mata Depo. at 23:21-24:9 (stating that the police pointed the gun only at Mata and that the officer did not point the gun at J.A.M.); however, there is evidence that J.A.M. may have been in the line of fire had Rahn fired his gun, <u>see</u> J.A.M. Depo. at 10:18-23, 11:10-18.   J.A.M. did not get out of the car, even though there is evidence in the record that he was not restrained the "entire time the car was moving on the roadway."  Ahlm Depo. at 76:1-24.  Under these circumstances, J.A.M. "was 'seized' within the meaning of the Fourth Amendment because no reasonable child would have believed that he was free to leave." <u>Doe v. Heck</u>, 327 F.3d 492, 510 (7th Cir. 2003)(finding that, under the circumstances, the child was seized when he was escorted from class by a principal, the defendant caseworkers, and a uniformed police officer, into the nursery and was then questioned about the details of his family life).  As the United States Court of Appeals for the Second Circuit stated in <u>Kia P v. McIntyre</u>, 235 F.3d 749 (2d Cir. 2000), in which it found a minor child was seized:

> Although the usual phrasing of the seizure test is difficult to apply here -- [the infant] is unlikely to have had a "belief" as to whether or not she was free to leave the Hospital -- [the infant's motion] was told in no uncertain terms that she could not take [the infant] home from the Hospital.  It was clear to [the mother], if not to [the infant], that [the infant] was not free to leave.

<u>Kia P v. McIntyre</u>, 235 F.3d at 762.  The Court will thus proceed to analyze the  excessive force claim on J.A.M.'s behalf.

### C.   A REASONABLE JURY COULD FIND THAT RAHN'S DISPLAY OF FORCE VIOLATED MATA'S AND J.A.M.'S FOURTH-AMENDMENT RIGHTS.

The Officer Defendants argue that Rahn is entitled to qualified immunity on the excessive force claim involving Mata and on the excessive force claim involving J.A.M., because the undisputed facts show that it was not unreasonable for Rahn to display his firearm at a traffic stop

involving a seatbelt violation.  The Officer Defendants argue that it is clear from the dashcam videotapes that a police officer, possessing all the facts that Rahn possessed at the time of the incident, could reasonably conclude that Mata's actions warranted a show of force.  Mata argues that Rahn used excessive force, because his actions were not objectively reasonable in the circumstances.

Courts analyze Fourth-Amendment excessive force claims "under the 'objective reasonableness' standard that governs other Fourth Amendment inquiries." Cordova v. Aragon, 569 F.3d at 1188.  See Graham v. Connor, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."). "In analyzing the reasonableness of the alleged seizure, the key inquiry is 'whether it would be clear to a reasonable officer [in the defendant's position] that his conduct was unlawful in the situation he confronted.'"  Thomas v. Durastanti, 607 F.3d at 663-664 (citations omitted).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. at 396 (citation omitted).  The Tenth Circuit has explained:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Weigel v. Broad, 544 F.3d at 1151-52 (internal quotation marks and citations omitted).

In Thomas v. Durastanti, the Tenth Circuit reversed a district court's decision denying an agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") qualified immunity from the plaintiff's claim that the agent violated his Fourth-Amendment right to be free from unreasonable seizures when the agent shot him.  See 607 F.3d at 658-59.  The evidence established

that:

Mid-afternoon on January 13, 2006, Agent Durastanti, accompanied by his partner, Agent Stephen Thompson, both dressed in plain clothes, were in an unmarked sport utility vehicle ("SUV") driving around Wichita, Kansas, looking for a fugitive.  As they did so, the agents noticed a white Lincoln town car speeding toward them and away from what the agents deemed to be a high crime area.  The Lincoln did not have a license plate in its tagwell.  The agents decided to follow the Lincoln.

The Lincoln stopped at a house a few blocks away, where one of the three occupants ran inside for a brief moment and then returned to the car, which immediately left.  By this time, Agent Durastanti noticed that, while the car did not have a regular license plate, it did have a dealer tag. When Agent Durastanti called a dispatcher to check the registration number on the dealer tag, however, the dispatcher informed him that the registration was "not in file."  Aplt. App. 103. Suspecting the Lincoln's occupants were up to no good, the agents continued to follow the car, and Agent Durastanti called for a uniformed officer to pull over the Lincoln.  Kansas State Trooper Tom Spencer responded.

The three men in the car -- driver Almario Smith, his brother, Plaintiff Ricky Lee Thomas, and a friend, Keith Jones -- were actually test-driving the Lincoln, with the permission of the dealership that owned the car.  All three men concede that Mr. Smith was speeding, but Mr. Thomas and Mr. Jones contend that Mr. Smith was not otherwise driving erratically.  The three men stopped at Mr. Smith's mother's house to see if she was home so Mr. Smith could show her the car.  Not finding her at home, the trio left her house soon after arriving.  At the time they left Mr. Smith's mother's home, Mr. Smith was driving, Mr. Thomas was in the front passenger seat, and Mr. Jones was in the back seat.  Using the freeway, Mr. Smith drove to a Valero gas station/convenience store so Mr. Jones could use the restroom and buy a pack of cigarettes.

The state trooper, the two ATF agents, and the Lincoln all arrived at the gas station at about the same time.  Mr. Smith entered the parking lot approximately ten seconds ahead of both the state trooper and the ATF agents.  The parking lot was busy and there were few parking spots open.  Mr. Smith stopped the Lincoln parallel to the convenience store, not in a designated parking space but between the two driveways that led from the parking lot back onto the street from where the Lincoln had just come.  The ATF agents entered the parking lot using the driveway that was directly in front of the Lincoln and parked facing the Lincoln, partially blocking the driveway that was the Lincoln's most natural path out of the lot.  The state trooper activated all of his emergency lights as he turned into the gas station, entered the parking lot through the driveway behind the Lincoln and parked a car's length behind and at an angle to the Lincoln.

The ensuing events occurring in the convenience store parking lot lasted approximately thirty-seven seconds. After the Lincoln stopped, Mr. Jones, who was in the back passenger seat, started to get out of the car to go inside the store when he noticed two men approaching with guns drawn and pointed at the Lincoln -- the ATF agents, dressed in plain clothes and giving no indication that they were police officers. It is undisputed that Agent Durastanti never identified himself as a police officer. And, although Agent Thompson asserted that he yelled "police," the men in the Lincoln never heard it.

The two armed approaching men, Agents Durastanti and Thompson, yelled for Mr. Jones to get back inside the car. At the same time, the state trooper, who had parked his marked patrol car, with its emergency lights activated, behind the Lincoln, partially exited his patrol car and yelled: "Have a seat in the car. Have a seat in the car." Video at 15:15:34-36. The trooper then yelled at the occupants of the Lincoln to put their hands where the trooper could see them. Mr. Jones reentered the Lincoln. All of this was visible to Agent Durastanti including the trooper's marked patrol car, emergency lights, and Mr. Jones' apparent compliance.

Once he reentered the Lincoln, Mr. Jones alerted Mr. Smith and Mr. Thomas about the two approaching armed men. Mr. Thomas feared that the two men intended to rob the Lincoln's occupants or otherwise harm them. According to Mr. Jones and Mr. Thomas, none of the men in the Lincoln noticed the state trooper behind them; Mr. Thomas finally saw the trooper when Mr. Thomas looked back for an escape route away from the two armed men approaching the Lincoln. But he did not have time to tell Mr. Smith, who was driving the Lincoln, about the trooper.

In an effort to get away, Mr. Smith began to drive the Lincoln out of the parking lot, maneuvering around the ATF agents' SUV, which was partially blocking the Lincoln's path. Agent Thompson, who was approaching the driver's side of the Lincoln, had to move out of the way of the Lincoln; as he did so, Agent Thompson hit the Lincoln's front passenger window with the butt of his weapon, trying to break the glass. Agent Durastanti proceeded from the driver's side of the agents' SUV toward the rear of that vehicle and into the path of the Lincoln as it headed around the agents' SUV toward the parking lot exit. Agent Durastanti would testify later that he was concerned that Agent Thompson was in distress, that the Lincoln was coming directly at him and his objective was to stop the Lincoln. Aplt.App. 114-115. Agent Durastanti fired several shots at the driver. The Lincoln, nevertheless, continued out of the parking lot, hitting Agent Durastanti, who rolled off its hood, landed on his feet, turned around and then fired two more shots at the back of the Lincoln as it proceeded down the street away from the Valero station. The state trooper and Agent Thompson gave chase. During the chase, the state trooper observed the driver open the door of the Lincoln and discard a plastic bag onto the street. Ultimately, the Lincoln stopped a few blocks away. Mr. Smith had been shot in the head; Mr. Thomas had suffered a gunshot wound to his leg.

607 F.3d at 659-61 (footnotes omitted).  The Tenth Circuit found that, even assuming Thomas could

meet the seizure element of his claim, he could not show "that it was unreasonable."  607 F.3d at

663.  The Tenth Circuit found that there was "no room for genuine disagreement as to the speed of

the Lincoln -- it was moving deliberately out of the parking lot," 607 F.3d at 664-65 (citation

omitted), but stated that, even if it accepted Thomas' argument that the videotape did not

conclusively establish the speed of the Lincoln, it would still conclude that the agent's actions were

objectively reasonable, see 607 F.3d at 665.

> As we discuss below, Agent Durastanti saw the trooper's marked patrol car behind the Lincoln, its emergency lights, and Mr. Jones' apparent compliance with the trooper's directive that Mr. Jones get back into the Lincoln.  A reasonable officer could certainly conclude that the Lincoln's occupants had notice of police presence.  Yet, the driver was pulling away from a traffic stop.  In the process, the driver was advancing toward Agent Durastanti placing him in harm's way.  No one argues that the driver was about to yield to pedestrians.  Even given a dispute about whether the Lincoln was accelerating, it goes without saying that an officer in close quarters is no match for a two-ton vehicle. . . .  Although Agent Durastanti's reasonable perceptions are what matters, he had mere seconds to react, and his actions in firing the first couple of shots were reasonable, even if mistaken.  An officer may be found to have acted reasonably even if he has a mistaken belief as to the facts establishing the existence of exigent circumstances.

607 F.3d at 665-66.  The Tenth Circuit stated that the sequence of events leading up to the time

when the Lincoln struck the agent was "key in analyzing the reasonableness" of the agent's actions

and stated that, assuming Thomas was wounded in the first volley of shots, it was "certainly

reasonable for Agent Durastanti to believe that he was in danger at the 'precise' time he fired the

first two shots and seized Mr. Thomas."  607 F.3d at 666.

        In Holland ex rel. Overdorff v. Harrington, the Tenth Circuit addressed whether the officers'

actions of pointing firearms at bystanders violated the plaintiffs' constitutional rights.  See 268 F.3d

at 1193.  The SWAT team arrived at a residence to conduct a search and arrest one individual

pursuant to lawful search and arrest warrants.  See 268 F.3d at 1192.  They knew in advance that

other persons, including children would be at the residence.  See 268 F.3d at 1192.  In conducting

the search and effecting the seizure of the individual, the SWAT team held each of the plaintiffs at

gunpoint,  "initially forcing several of them to lie down on the ground for ten to fifteen minutes, and

ultimately gathering all of them in the living room of the residence where they were held until all

but [the individual for whom they had the arrest warrant] were released."  268 F.3d at 1192.

> The district court acknowledged that "the right to arrest an individual carries with it
> the right to use some physical coercion to effect the arrest," and that it is "not
> unreasonable for officers to carry weapons or to take control of a situation by
> displaying their weapons."  (Order, dated August 3, 1999, at 16 (citing Thompson
> v. City of Lawrence, Kansas, 58 F.3d 1511, 1516 (10th Cir. 1995)).)  However, the
> district court concluded that "the undisputed testimony that the SWAT team pointed
> weapons at young children during the entry" raised a triable issue as to
> reasonableness, and denied defendants' motion for summary judgment (Id.)

268 F.3d at 1192.  The Tenth Circuit found that prior case law supported the district court's

conclusion as to reasonableness.  See 268 F.3d at 1192.

> In Baker v. Monroe Township, 50 F.3d 1186 (3d Cir. 1995), police officers
> detained four persons, two of whom were minors, who were approaching a house
> that was the subject of a drug raid.  The officers ordered the four down on the
> ground, handcuffed them, and held them at gunpoint.  The Third Circuit held their
> continued detention at gunpoint to be unreasonable; the four persons had not
> attempted to resist or interfere, and there was "simply no evidence of anything that
> should have caused the officers to use the kind of force they are alleged to have
> used."  Id. at 1193.
>
> In McDonald v. Haskins, 966 F.2d 292 (7th Cir.1992), the Seventh Circuit
> held that a police officer violated Fourth Amendment rights by aiming his firearm
> at the head of a nine-year-old boy and threatening to pull the trigger.  The child "was
> not being arrested, nor was he even suspected of committing a crime," and posed no
> threat to the officer, other officers or the community.  Id. at 294 (citing Black v.
> Stephens, 662 F.2d 181, 189 (3d Cir. 1981) ("For an unidentified officer to brandish
> his revolver eighteen inches from [the subject]'s head with [his wife] in the precise
> line of fire and then threaten to shoot, is conduct that shocks the conscience.")).

268 F.3d at 1192.  The Tenth Circuit stated that the "display of weapons, and the pointing of

firearms directly at persons inescapably involves the immediate threat of deadly force[;] [s]uch a

show of force should be predicated on at least the perceived risk of injury or danger to the officers,

based upon what the officers know at the time."  268 F.3d at 1192.  "These are the very ingredients

relevant to an excessive force inquiry."  268 F.3d at 1192-93 (quoting McDonald v. Haskins, 966

F.2d at 294).

> Where a person has submitted to the officers' show of force without resistance, and
> where an officer has no reasonable cause to believe that person poses a danger to the
> officer or to others, it may be excessive and unreasonable to continue to aim a loaded
> firearm directly at that person, in contrast to simply holding the weapon in a fashion
> ready for immediate use.  Pointing a firearm directly at a child calls for even greater
> sensitivity to what may be justified or what may be excessive under all the
> circumstances.

> In McDonald, the Seventh Circuit explained:

>> It should have been obvious to Haskins that his threat of deadly force
>> -- holding a gun to the head of a 9-year-old and threatening to pull the
>> trigger -- was objectively unreasonable given the alleged absence of
>> any danger to Haskins or other officers at the scene and the fact that
>> the victim, a child, was neither a suspect nor attempting to evade the
>> officers or posing any other threat.  As we observed in Lester, 830
>> F.2d [706, 711 (7th Cir. 1987)], "Although the issue in [Tennessee v.]
>> Garner [471 U.S. 1 (1985)] was deadly force, implicit in its totality
>> of the circumstances approach is that police use of less than deadly
>> force would violate the Fourth Amendment if not justified under the
>> circumstances."

> 966 F.2d at 295.

268 F.3d at 1193.  The Tenth Circuit concluded that, taken in the light most favorable to the

plaintiffs, "the acts alleged concerning the pointing of firearms at the child bystanders found at the

Heflin residence on April 16, 1996 show the officers' conduct violated a constitutional right."  298

F.3d at 1193.  "While the SWAT Team's initial show of force may have been reasonable under the

circumstances, continuing to hold the children directly at gunpoint after the officers had gained

complete control of the situation outside the residence was not justified under the circumstances at

that point."  268 F.3d at 1193.  The Tenth Circuit stated that pointing a gun at the children rendered

-43-

the "seizure of the children unreasonable, violating their Fourth Amendment rights."  268 F.3d at

1193.

In Mecham v. Frazier, 500 F.3d 1200 (10th Cir. 2007), the Tenth Circuit reversed the district

court's denial of the officers' motion for summary judgment on the grounds of qualified immunity.

See 500 F.3d at 1202.  Frazier pulled Mecham over as she was driving on Interstate Highway I-15;

he approached her car, and told her she was being pulled over for driving five miles over the speed

limit and for failing to wear her seat belt.  See 500 F.3d at 1202.  Frazier learned that the Arizona

license Mecham gave him was suspended, but dispatch informed him that she had a valid Utah

license; when Frazier inquired about a Utah license, Mecham told him that she did not have a Utah

license.  See 500 F.3d at 1202.  "Frazier accordingly told Mecham she could not drive without a

license and that the car would be impounded unless she could arrange for someone to pick it up."

500 F.3d at 102.  Mecham's mother called her cellular telephone, and Mecham took the call,

ignoring Frazier when he told her to put down the telephone while he explained the citation.  See

500 F.3d at 102.  When Mecham refused to end her telephone conversation, Frazier called dispatch

to order a tow truck.  See 500 F.3d at 1202.  When the tow truck arrived, Frazier told Mecham the

car was being impounded and "to get out of the car."  500 F.3d at 1202.  " Mecham said she was

going to sit in her car until her mother arrived."  500 F.3d at 1202.  Frazier called for backup, and,

when another officer arrived several minutes later, Frazier told the officer that he was going to arrest

Mecham because she had been uncooperative and refused to get out of her car.  See 500 F.3d at

1202-03.

> Frazier approached Mecham's car from the driver's side while Johnson approached
> from the passenger's side. Frazier told Mecham to get out of the car or he would have
> to physically remove her, but she again refused.  Frazier then sprayed Mecham in the
> face with pepper spray, opened the driver's side door, and physically removed her
> from the car. Johnson and Frazier pulled Mecham to the rear of the car, put her on

-44-

the ground, and handcuffed her.

500 F.3d at 1203.  The Tenth Circuit stated that, "viewed in light of the last two *Graham* factors

quoted above -- the suspect's resistance to arrest and safety concerns -- the officers conduct in this

case was reasonable."  500 F.3d at 1204.  The Tenth Circuit stated:

> Nevertheless, what should have been a routine encounter turned into a fifty-minute ordeal requiring arrest.  Before the officers used force to remove Mecham from her car, the following events occurred.  (1) Mecham balked at Frazier's report that her Arizona license was suspended -- insisting it was valid -- and then contributed to the unresolved mystery about her Utah license on file by denying its existence.  (2) She then persisted in using a cell phone during the encounter despite Frazier's instructions to put it down.  (3) She ignored his repeated warnings to get out of the car under penalty of arrest, and forced Frazier to call a tow truck and backup support.  (4) During this encounter, she remained in the driver's seat with the keys to the car, exercising control of the car at all times.  (5) When backup officer Johnson arrived on the scene, she nonetheless ignored his additional entreaties to exit the car.  (6) Then, she was given a last opportunity to cooperate when the officers told her point blank that further resistance would be met with arrest.  (7) Mecham, again, refused and the officers followed through with their promised response.  In these circumstances, it was a foregone conclusion that the officers would have to use force to make the arrest.

500 F.3d at 1204-05 (footnote omitted).  The Tenth Circuit stated:

> The objective reasonableness of the use of force was further reinforced by safety concerns.  The encounter played out on the narrow shoulder of a busy interstate highway.  The arrest videotape depicts the busy, high speed traffic on Interstate Highway I-15.  Parked on the shoulder, Mecham's car was just a few feet from the highway's edge.  An officer could reasonably be concerned that Mecham might create a danger to herself or others if not first subdued.  While Frazier did not believe she was a flight risk, the fact of the matter was that she had her keys and control of the car while refusing to cooperate.  In sum, Mecham's disregard for the officers' instructions, the length of the encounter, and the implausibility of Mecham's rationale for not cooperating, lead us to conclude that the officers' use of force was justified in these circumstances.

500 F.3d at 1205.

In Fogarty v. Gallegos, 523 F.3d 1147 (10th Cir. 2008), the Tenth Circuit found that "each

of the Graham factors balances in Fogarty's favor" and thus held that the "level of force was

unreasonable under the circumstances Fogarty recounts." 523 F.3d at 1161. The Tenth Circuit first

considered the severity of the crime at issue. See 523 F.3d at 1160.

> As discussed, defendants contend that Fogarty engaged in disorderly conduct. Disorderly conduct, under New Mexico law, is only a petty misdemeanor, the least serious of the three classes of state criminal offenses. See N.M. Stat. Ann. §§ 30-20-1, -1-6 (defining felonies, misdemeanors, and petty misdemeanors). Assuming for the purposes of our independent excessive force analysis that Fogarty had indeed committed disorderly conduct, his infraction would be among the least severe crimes contemplated by New Mexico law, and the amount of force used should have been reduced accordingly. See Casey v. City of Fed. Heights, 509 F.3d 1278, 1281 (10th Cir. 2007) (holding that when a plaintiff is suspected of committing a minor misdemeanor, this fact "reduces the level of force that was reasonable [for an officer] to use").

523 F.3d at 1160. The Tenth Circuit then considered whether Fogarty posed an immediate threat

to the safety of officers or others, and found that there was no suggestion that he did. See 523 F.3d

at 1160.

> At the point when the officers used force against him, Fogarty was kneeling on the steps of the bookstore. He was unarmed and had been drumming intermittently and peacefully. Even if his behavior played a role in inciting the crowd to remain in the middle of Central Avenue, which is contrary to Fogarty's version of events, it remains far from clear that the protesters presented any immediate threat to the officers or public safety. In denying qualified immunity, the district court had before it testimony that the officers' main priorities in dispersing the protesters were reopening the street to traffic and avoiding disruption to local businesses, not quelling an immediate threat of violence. Under the district court's view of the evidence, Fogarty's behavior presented no immediate threat to anyone's physical safety. Accordingly, this factor also suggests that the force used against Fogarty was unreasonable.

523 F.3d at 1160. The Tenth Circuit then found that Fogarty was neither actively resisting arrest

nor attempting to evade arrest by flight. See 523 F.3d at 1160.

> After reviewing the record, the district court found that "[n]o police officer notified [Fogarty] that he was under arrest, nor did they ask him to come along peacefully." It concluded that "[t]here is no indication, even by Defendants' version, that Plaintiff ever resisted arrest or attempted to evade arrest, which would have called for the use of a higher degree of force." This factor therefore also tilts the scale in the direction of unreasonable force. See Casey, 509 F.3d at 1282.

523 F.3d at 1160.  The Tenth Circuit also noted that Fogarty presented evidence indicating that the

police may have "contributed to the need to use force."  523 F.3d at 1161.

> Fogarty stated that APD's decision to block off Central Avenue led him to believe
> that police were allowing protesters to march in the streets.  In addition, one witness
> stated that the protest was peaceful until police "enraged" the crowd by initiating
> "unnecessary" arrests.  Although perhaps less persuasive than the other three factors,
> these contentions, if true, would also suggest that APD used more force than
> reasonable.

523 F.3d at 1161.  The Tenth Circuit also noted that the amount of force that the police used against

Fogarty was considerable, stating that Fogarty alleged that he was hit with a "rifle-fired projectile"

and that four to five officers grabbed him, "thrust him to the ground, and forcibly escorted him

through a cloud of tear gas," and that, when he had difficulty breathing, the officers used "an

incredible amount of force" to put his wrist "into a painful hyperflexion position."  523 F.3d at 1161.

The Tenth Circuit held that this level of force was unreasonable.  See 523 F.3d at 1161.

In Baird v. Renbarger, 576 F.3d 340 (7th Cir. 2009), the United States Court of Appeals for

the Seventh Circuit addressed whether the defendant violated the plaintiffs' Fourth-Amendment

rights through an unreasonable seizure done with the use of excessive force -- "by using a

submachine gun to round them up and detain them during the search."  576 F.3d at 344.  The

Seventh Circuit stated that "[t]he factors identified in Graham all tend to show that the use of the

submachine gun was objectively unreasonable in the setting that [the defendant] faced."  576 F.3d

at 344.

> First, the search and seizure concerned the crime of altering a special identification
> number.  See Ind.Code § 9-18-8-12 (2008).  This is a far cry from crimes that contain
> the use of force as an element, crimes involving possession of illegal weapons, or
> drug crimes, all of which are associated with violence.  Second, there was never a
> reason to suspect that there was any threat to the safety of the officers involved.
> McCracken had been to the site the day before, and the officers made no mention of
> danger or violence during the search.  Third, none of the plaintiffs resisted detention
> or attempted to flee.

576 F.3d at 344.  The Seventh Circuit stated that it had found "similar uses of force unreasonable in other cases."  576 F.3d at 345.

> For example, we held that gun pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment.  See Jacobs v. City of Chicago, 215 F.3d 758, 773-74 (7th Cir. 2000) (pointing a gun at an elderly man's head for ten minutes even after realizing that he is not the desired suspect and when he presents no resistance is "out of proportion to any danger that Jacobs could possibly have posed to the officers or any other member of the community"); McDonald v. Haskins, 966 F.2d 292, 294-95 (7th Cir. 1992) (pointing a gun at a nine-year-old child during a search and threatening to pull the trigger was "objectively unreasonable").  In a slightly different context, we observed that "police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever." Clash v. Beatty, 77 F.3d 1045, 1048 (7th Cir. 1996).

576 F.3d at 345.  The Seventh Circuit distinguished cases in which they found comparable conduct to be reasonable, as the facts in those cases involved a serious potential danger to the police.  See 576 F.3d at 345.  The Seventh Circuit thus concluded that, "taking the facts in the light most favorable to the plaintiffs, a reasonable jury could find that Renbarger violated the plaintiffs' rights under the Fourth Amendment."  576 F.3d at 345.

Taking the facts in the light most favorable to Mata, a reasonable jury could find that Rahn violated Mata's rights under the Fourth Amendment.  The severity of the infraction that Mata committed -- failure to wear his seatbelt -- is low.  Failure to wear a seatbelt is a "petty misdemeanor."  Rahn Depo. at 43:12-13.  See N.M.S.A. 1978, §§ 66-8-122, 66-7-373.  Mata's infraction is thus "among the least severe crimes contemplated by New Mexico law, and the amount of force [Rahn used] should have been reduced accordingly." Fogarty v. Gallegos, 523 F.3d at 1160 (citing Casey v. City of Fed. Heights, 509 F.3d 1278, 1281 (10th Cir. 2007)(holding that, when a plaintiff is suspected of committing a minor misdemeanor, this fact "reduces the level of force that was reasonable [for an officer] to use")).  This factor thus weighs in Mata's favor.

Viewing the evidence in the light most favorable to Mata, the Court finds that a reasonable

jury could find that Mata did not pose an immediate threat to the safety of the officers or others.  The Officer Defendants argue that it was reasonable for Rahn to conclude Mata could pose a danger to him, because he was only a few feet away from the front wheels of Mata's vehicle, because, although the vehicle was moving slowly, Rahn was in close proximity to Mata, who, the Defendants allege, had shown a dismissive attitude to traffic safety laws, and because Rahn had only seconds to judge whether Mata's vehicle might accelerate or turn into his path.  The Defendants cite to Thomas v. Durastanti in support of their position.  In Thomas v. Durastanti -- a case which involved a Bivens action as opposed to a § 1983 claim and the use of deadly force as opposed to a show of force -- the Tenth Circuit stated that the driver of the Lincoln was pulling away from a traffic stop and was, in the process, "advancing toward Agent Durastanti placing him in harm's way."  607 F.3d at 665.  The Tenth Circuit stated that, "[e]ven given a dispute about whether the Lincoln was accelerating, it goes without saying that an officer in close quarters is no match for a two-ton vehicle."  607 F.3d at 665 (citation omitted).  Rahn was standing on the driver's side of Mata's vehicle, several feet away from the vehicle, approximately parallel to the front bumper of the vehicle; as Mata's vehicle slowly moved forward Rahn walked closer to Mata's vehicle so that he was parallel with the front driver's side wheel of Mata's vehicle as he was pulling out his firearm.  See Unit 9853 Dashcam at 20:45:11-12; Unit 9844 Dashcam at 20:45:06.  Unlike the agent in Thomas v. Durastanti, who was in harm's way because he was in the path of the Lincoln as it proceeded, albeit slowly towards him, Rahn was not in the path's of Mata's vehicle -- rather he was on the side of the vehicle's path.  Although an officer is no match for a two-ton vehicle, Mata's vehicle was not proceeding towards Rahn, and was not placing Rahn in harm's way.  None of the officers who conducted the stop were in the path of Mata's vehicle -- they were all on the side of Mata's vehicle.  See Unit 9844 Dashcam at 20:45:06-23.  Mata's actions of slowly moving his

vehicle forward thus did not pose an immediate threat to the officers' safety.  Furthermore, there is no evidence that Mata's actions posed an immediate threat to any of the bystanders; Unit 9844 Dashcam shows that there were no bystanders in the path of Mata's vehicle.  See Unit 9844 Dashcam at 20:45:06.  Mata's actions thus did not pose an immediate threat to the safety of others. This factor therefore weighs in Mata's favor.

Mata appeared to be pulling away from a traffic stop.  Mata and Ahlm engaged in a heated exchange whether Mata was driving and whether his vehicle was moving.  See Unit 9853 Dashcam at 20:44:50-20:45:09; Unit 9844 Dashcam at 20:44:50-20:45:09.  Ahlm told Mata he was going to write him a ticket; he told Mata that he was not free leave, saying: "[D]on't leave, you're not free to leave, sir."  Unit 9853 Dashcam at 20:45:05-10.  As Ahlm had his back turned and was heading over to the squad car, Mata responded "Well, I need to go" and proceeded to slowly pull forward. Unit 9853 Dashcam at 20:45:08-15; Unit 9844 Dashcam at 20:45:08-11; Unit 10029 Dashcam at 20:45:08-11.  The three police vehicles surrounding his residence confined Mata's ability to move his vehicle.  See Map of Position of Vehicles at 1.  Rahn, who was standing several feet to the side of Mata's front wheel, moved back a step as Kee could be heard yelling at Mata to "[s]top."  Unit 9853 Dashcam at 20:45:10-15; Unit 9844 Dashcam at 20:45:10-15.  See Rahn Depo. at 71:1-15. Mata did not obey the order to stop and continued to slowly move his vehicle forward several feet as Rahn reached back and removed his firearm from the holster, and trained it on Mata, ordering him to stop.  See Unit 9853 Dashcam at 20:45:10-15; Unit 9844 Dashcam at 20:45:10-15.  Although Mata was not attempting to resist or evade arrest, there is evidence that he appeared to be pulling away from a traffic stop.  This factor thus weighs in Rahn's favor.

The "first two Graham factors weigh in [Mata's favor] and so weigh in favor of a trial in this matter."  Herrera v. Bernalillo County Bd. of County Comm'rs, 361 F. App'x 924, 928 (10th Cir.

2010).  The Court cannot say, on the record before it as it currently exists, "that no reasonable jury could find that [Rahn's] use of force was excessive."  Herrera v. Bernalillo County Bd. of County Comm'rs, 361 F. App'x at 928.

Taking the facts in the light most favorable to the non-moving party, a reasonable jury could find that Rahn violated J.A.M.'s rights under the Fourth Amendment.  The Court cannot say, on the record before it, that no reasonable jury could find Rahn's use of force against Mata excessive. Furthermore, there is no evidence that J.A.M. posed "a perceived risk of injury or danger to the officers or others."  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1192.  J.A.M. was not a suspect; he was not attempting to evade the officers; nor was he posing any threat.  See Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1193 (citing McDonald v. Haskins, 966 F.2d at 295). Although Rahn did not train his firearm on J.A.M., taking the facts in the light most favorable to Mata, J.A.M. was in the line of fire, and "[p]ointing a firearm . . . at a child calls for even greater sensitivity to what may be justified or what may be excessive under all the circumstances."  268 F.3d at 1193.  Taking the facts in the light most favorable to Mata, J.A.M. was in the line of fire for approximately eleven seconds.  See Unit 9853 Dashcam at 20:45:12-22.  The Court cannot say that no reasonable jury could find that Rahn's use of force in these circumstances was excessive. See Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1192-93.

## D.   AT THE TIME OF THE INCIDENT, THE LAW CLEARLY ESTABLISHED THAT POINTING FIREARMS AT A PERSON SHOULD BE PREDICATED ON A PERCEIVED RISK OF INJURY OR DANGER TO THE OFFICERS OR OTHERS.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Thomas v. Durastanti, 607 F.3d at 669 (citation omitted).  "Although the very action

in question does not have to have previously been held unlawful, 'in the light of pre-existing law the unlawfulness must be apparent.'" Mick v. Brewer, 76 F.3d at 1134 (citations omitted). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Thomas v. Durastanti, 607 F.3d at 669 (quoting Medina v. City and County of Denver, 960 F.2d at 1498; citing Smith v. Cochran, 339 F.3d at 1215). "While there does not have to be a case that is factually identical, it must still be apparent to a reasonable officer in light of pre-existing law that his conduct was unlawful." Thomas v. Durastanti, 607 F.3d at 669. The Tenth Circuit has stated that "an officer's violation of the Graham reasonableness test is a violation of clearly established law if there are 'no substantial grounds for a reasonable officer to conclude that there was legitimate justification' for acting as she did." Buck v. City of Albuquerque, 549 F.3d 1269, 1291 (10th Cir. 2008)(citations omitted).

In 2008, the law was clearly established that the display of firearms "and the pointing of firearms directly at persons . . . should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time." Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1192. In Holland ex rel. Overdorff v. Harrington, the Tenth Circuit in 2001 stated that it could "find no substantial grounds for a reasonable officer to conclude that there was legitimate justification" to train their weapons on the plaintiffs when they had no "reason to believe that the [plaintiffs] posed any kind of threat," or to "train[ ] a firearm directly upon a four-year-old child at any time during the operation." 268 F.3d at 1197. The Tenth Circuit stated that the "violation [did] not reflect a reasonable mistake of law for which [the officer] should enjoy the benefits of qualified immunity," and thus found that the district court properly denied summary judgment in favor of the officer on his assertion of qualified immunity. See 268 F.3d at 1197. As

in Holland v. ex rel. Overdorff v. Harrington, where the Tenth Circuit found that there were no substantial grounds for the officers to conclude there was a legitimate justification for training their weapons on the plaintiffs when they had no reason to believe the plaintiffs posed a threat, there are no substantial grounds for Rahn to conclude there was a legitimate justification for training his weapon on Mata, with J.A.M. in the line of fire, because -- taking the facts in the light most favorable to Mata -- the facts do not demonstrate that Rahn had reason to believe that Mata or J.A.M. posed an immediate threat to the officers' safety or the safety of others. Rahn's alleged violation of Mata's and J.A.M.'s constitutional rights thus does not reflect a reasonable mistake of law for which he should enjoy the benefits of qualified immunity. See Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1197.

The Defendants rely on Thomas v. Durastanti for the proposition that it is "clear that the established weight of legal authority for this Circuit did not hold in 2008, and it does not hold now, 'that an officer may not draw his weapon when there is a rapidly developing situation with a traffic stop and the officer's concerns have not been obviated." Motion at 21 (citing Thomas v. Durastanti, 607 F.3d 669). In Thomas v. Durastanti, the Tenth Circuit noted that the district court had cited Holland ex rel. Overdorff v. Harrington as "establishing that the pointing of firearms . . . should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time." Thomas v. Durastanti, 607 F.3d at 669 (citation omitted). The Tenth Circuit stated:

> Holland is not factually analogous. In Holland, the police pointed firearms at children and held the children at gunpoint after the officers had gained complete control of the situation. 268 F.3d at 1193. Here, in contrast, there was a rapidly developing situation and the officers clearly did not have complete control of the events that were unfolding. While Holland clearly states that the display of weapons should be predicated on a perceived risk of danger based on what an officer knows at the time, none of the risks or concerns identified by Agent Durastanti had been

> obviated when his weapon was displayed.  Holland simply does not clearly establish that an officer may not draw his weapon when there is a rapidly developing situation with a traffic stop and the officers' concerns have not been obviated.

607 F.3d at 669.  Thomas v. Durastanti was decided in 2010 whereas this incident occurred in 2008. Even had the Tenth Circuit decided Thomas v. Durastanti before this incident, unlike Thomas v. Durastanti, where none of the risks of concerns Durastanti identified -- his concern that his fellow agent was in distress and the risk of the two-ton vehicle proceeding directly towards him -- were obviated when he drew his weapon, neither Rahn nor any of the other officers or bystanders were in the path of Mata's vehicle.  There is thus no evidence that Rahn could reasonably have had concerns about his or others' safety when he drew his weapon.  The Court therefore believes that Thomas v. Durastanti is not factually analogous.

Because a reasonable jury could find that Rahn's conduct violated Mata's and J.A.M.'s constitutional rights, and because Mata's and J.A.M.'s constitutional rights were clearly established at the time of the alleged violation, Mata has satisfied his burden.  See Nelson v. McMullen, 207 F.3d at 1206.  The Court cannot properly hold, at this stage in the case, that, as a matter of law, Rahn is entitled to qualified immunity, because a reasonable jury could find that Rahn's conduct violated Mata's and J.A.M.'s constitutional rights.  See Herrera v. Bernalillo County Bd. of County Comm'rs, 361 F. App'x at 928.  The Court will thus deny Rahn's request for summary judgment in his favor against Mata's excessive force claim and Mata's excessive force claim on J.A.M.'s behalf on the grounds of qualified immunity.

III.    **AHLM IS ENTITLED TO QUALIFIED IMMUNITY ON MATA'S CLAIM FOR FAILURE TO INTERVENE ON G.M.'S BEHALF BUT HE IS NOT ENTITLED TO QUALIFIED IMMUNITY ON MATA'S CLAIMS FOR FAILURE TO INTERVENE ON HIS OWN BEHALF AND ON J.A.M.'S BEHALF.**

The Officer Defendants argue that Ahlm is entitled to qualified immunity on the claim that

he failed to intervene and prevent Rahn from violating Mata's constitutional rights.  They argue that, if Mata cannot show that Rahn used excessive force in stopping Mata's vehicle, he cannot establish a necessary predicate act for his failure-to-intervene claim.  They argue that, additionally, even if Mata can establish that Rahn used excessive force, videotape evidence shows that Ahlm was not in a position to prevent Rahn from drawing his firearm on Mata.  They argue that liability attaches only when an officer has a realistic opportunity to intervene, and Ahlm did not have such an opportunity.

Mata argues that Ahlm is not entitled to qualified immunity.  He argues that Rahn's actions were unreasonable and excessive, and that Ahlm had a duty to stop his fellow officer and had the opportunity to do so.

Ahlm is entitled to qualified immunity on Mata's failure to intervene claim on G.M.'s behalf.  Establishing a constitutional violation is a necessary predicate to any claim that an officer failed to intervene.  See Hall v. Burke, 12 F. App'x at 861 ("An officer who fails to intercede is liable . . . where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official[.]").  Mata cannot show that Rahn violated G.M.'s constitutional rights.  Ahlm is thus entitled to qualified immunity on Mata's failure-to-intervene claim brought on G.M.'s behalf.

"An officer who fails to perform a duty may be liable under § 1983 if that failure causes deprivation of protected rights."  Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423, 1433 (10th Cir. 1984)(citing McClelland v. Facteau, 610 F.2d 693 at 696 (10th Cir. 1979), judgement vacated on other grounds by City of Lawton, Okla. v. Lusby, 474 U.S. 805 (1985).  An officer may be liable if he had the opportunity to prevent or stop a constitutional violation, but failed to do so.  See Lusby v. T.G. & Y. Stores, Inc., 749 F.2d at 1433.  The Tenth Circuit has stated:

> [I]t is clearly established that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.  An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official [.] In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring. Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.

Hall v. Burke, 12 F. App'x at 861 (citation omitted).  In Mick v. Brewer, 76 F.3d 1127 (10th Cir. 1996), the Tenth Circuit found that the district court erroneously awarded the defendant qualified immunity at the summary judgment stage, because there was a genuine issue of material fact whether the defendant "observed the interaction and failed to intervene to prevent [the other defendant] from using allegedly excessive force." 76 F.3d at 1137.  In Fogarty v. Gallegos, 523 F.3d 1147 (10th Cir. 2008), the Tenth Circuit found that the district court was correct to deny summary judgment on the grounds there was an issue of fact whether the officer could be liable for failing to intervene in the alleged excessive use of force when the plaintiff described the arrest as lasting between three and five minutes, and when the district court found that the officer was present for the arrest, which, together, supported a "conclusion that [the officer] had the opportunity to prevent [the plaintiff's] injuries."  523 F.3d at 1164 (citing O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir.1988)(holding that defendant had no duty to intervene when "three blows were struck in such rapid succession that [the defendant] had no realistic opportunity to attempt to prevent them"); Lusby v. T.G. & Y. Stores, Inc., 749 F.2d at 1433 (reasoning that defendant officers were potentially liable when they "could have prevented or stopped" a fellow officer's assault).  In O'Neill v. Krzeminski, the United States Court of Appeals for the Second Circuit stated:

In this case, the claim that Conners became liable for use of excessive force by failing to intercede must be assessed separately with respect to the acts of Fiorillo and Krzeminski in striking O'Neill and the act of Krzeminski in dragging O'Neill across the floor by his throat.  Even when the evidence is viewed in the light most favorable to the plaintiff, there is insufficient evidence to permit a jury reasonably to conclude that Conners' failure to intercede was a proximate cause of the beating. The three blows were struck in such rapid succession that Conners had no realistic opportunity to attempt to prevent them.  This was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator.  With respect to the subsequent dragging of O'Neill across the floor, however, the case against Conners is adequate to create an issue of fact for the jury.  Having seen the victim beaten, he was alerted to the need to protect O'Neill from further abuse.  Though not a guarantor of O'Neill's safety in the face of brutality administered by other officers, Conners can be found liable for deliberately choosing not to make a reasonable attempt to stop Krzeminski.

839 F.3d at 11-12.

There is a genuine issue of material fact whether Ahlm had a realistic opportunity to intervene.  As Rahn removed his firearm from the holster, Ahlm was approximately 15 feet away standing by his squad car, but he was facing Mata's SUV.  See Ahlm Depo. at 78:7-16, 99:11-21, 100:1-8; Unit 9844 Dashcam at 20:45:09-13; Unit 9853 Dashcam at 20:45:13 (showing Ahlm facing the SUV as Rahn is reaching to pull his firearm out of its holster).  Once Ahlm heard Kee and Rahn order Mata to stop again, Ahlm moved in behind Rahn.  See Ahlm Depo. at 99:17-21; Unit 9853 Dashcam at 20:45:10-18.  As Ahlm moved in behind Rahn, Kee crossed in front of Ahlm's path to position himself to one side of Rahn.  See Ahlm Depo. at 100:9-15; Unit 9853 Dashcam at 20:45:12-15. Approximately eleven seconds elapsed from the time that Rahn pulled out his firearm and ordered Mata to stop until the time that he re-holstered the firearm as Kee moved in to extract Mata from the car.  See Unit 9853 Dashcam at 20:45:12-22.  As in Fogarty v. Gallegos, where the Tenth Circuit affirmed the district court's denial of summary judgment when the alleged violation of constitutional rights lasted several minutes and the officer was present for the alleged violation, taking the facts in the light most favorable to Mata, Ahlm saw the alleged constitutional violation,

was in close proximity to the alleged constitutional violation, and the alleged constitutional violation lasted for approximately eleven seconds.  Although eleven seconds is a not nearly as long a period as the three to five minutes in <u>Fogarty v. Gallegos</u>, it may be a longer period of time than the time in <u>O'Neill v. Krzeminski</u> it took to strike three blows in rapid succession -- which may take only a second or two.  The Court believes that, given Ahlm's presence in close proximity to Rahn, his view of Rahn pulling out his firearm, and the length of the alleged constitutional violation, a reasonable jury could find that Ahlm had a realistic opportunity to intervene, or was capable of preventing or ending Rahn's alleged use of excessive force.  <u>See</u> <u>Hall v. Burke</u>, 12 F. App'x at 861.  The Court will thus deny Ahlm's request for summary judgment in his favor on the grounds of qualified immunity against Mata's claims for failure to intervene on his own behalf and on J.A.M.'s behalf.

**IT IS ORDERED** that the City Defendants' Motion for Partial Summary Judgment No. I: Motion by Officers Rahn and Ahlm for Qualified Immunity on Excessive Force and Failure to Intervene Claims in Counts I and II, filed March 31, 2011 (Doc. 50), is granted in part and denied in part in accordance with this Memorandum Opinion and Order; and (ii) the Motion to Strike Certain References in Plaintiffs' Response to City Defendants' Motion for Partial Summary Judgment No. I *[Docket No. 55]*, filed April 22, 2011 (Doc. 62), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Santiago E. Juarez
Albuquerque, New Mexico

*Attorney for the Plaintiff*

-58-

Luis E. Robles
Terri S. Beach
Robles, Rael & Anaya
Albuquerque, New Mexico

*Attorneys for the Defendants*